*345
 
 Opinion
 

 SPARKS, J.
 

 This appeal involves the revocation of plaintiff Diane S. Poliak’s license to practice psychology. After a hearing, an administrative law judge (ALJ) determined cause for discipline existed because plaintiff had been grossly negligent in the practice of her profession and had had sexual relations with a patient. (Bus. & Prof. Code, §§ 726, 2960, subds. (j), (o).) In his proposed decision, the ALJ recommended a stayed revocation of plaintiff’s license and three years of probation under specified terms and conditions.
 

 The Board of Psychology (the Board) decided not to adopt the ALJ’s proposed decision. After further briefing and argument, the Board issued a decision that reiterated many of the ALJ’s findings but concluded that plaintiff’s license should be revoked.
 

 Plaintiff appeals from the subsequent denial of her petition for writ of administrative mandamus. She contends that pursuant to Government Code section 11517, subdivision (d), the ALJ’s proposed decision must have been deemed to have been adopted because the Board failed to “commence proceedings to decide the case" within 100 days of receiving the ALJ’s decision. She further contends revocation of her license is an excessive penalty.
 

 At the request of the court, the parties also filed supplemental briefs on the question of whether the woman in question remained a “patient” within the meaning of the disciplinary statutes after the professional relationship between the two had ended. Plaintiff contends that she could not have engaged in the practice of her profession with respect to the former patient after their professional relationship had been terminated. We agree and therefore shall remand the proceedings to the Board for reconsideration of the appropriate penalty to be imposed.
 

 Factual and Procedural Background
 

 Plaintiff was licensed as both a psychologist and as a marriage, family and child counselor (MFCC). She received her Ph.D. in professional psychology in 1980 and opened a private practice.
 

 In an amended accusation filed in May 1993, the Board charged plaintiff with several acts of unprofessional conduct, including gross negligence and engaging in sexual relations with a patient. Similar allegations were filed by the Board of Behavioral Science Examiners (BBSE), the entity that oversees
 
 *346
 
 MFCC’s. The two accusations were consolidated for hearing before an ALJ. We defer a detailed recitation of the facts underlying this disciplinary proceeding until our discussion of the legal significance of the termination of the professional relationship between plaintiff and her former patient.
 

 A hearing was held in December 1993, and in January 1994, the ALJ issued his proposed decision ordering a stayed revocation of plaintiff’s licenses and a three-year period of probation, subject to numerous terms and conditions. The BBSE adopted the ALJ’s decision but the Board did not. Instead, the Board issued a notice of nonadoption focusing on the question of whether probation was the appropriate discipline to be imposed. After reviewing additional written argument and holding another hearing, the Board issued a decision incorporating many of the ALJ’s findings but concluding that plaintiff’s conduct warranted revocation of her license.
 

 Plaintiff filed a petition for writ of administrative mandamus in superior court. She contended that under Government Code section 11517, subdivision (d), the ALJ’s proposed decision became effective by operation of law because the Board failed to “commence proceedings” within 100 days of receipt of that decision. She further claimed there was insufficient evidence to support some of the Board’s findings, and urged that the penalty imposed was excessive.
 

 The trial court rejected plaintiff’s challenge to the timeliness of the Board’s action, agreed with some of plaintiff’s evidentiary claims and rejected others, and determined that the Board did not abuse its discretion in revoking plaintiff’s license. The trial court denied plaintiff’s writ petition and this appeal followed.
 

 Discussion
 

 I.
 
 Timeliness of the Board’s Action
 

 Plaintiff contends the ALJ’s decision became effective by operation of law due to the Board’s failure to comply with the time requirements specified in Government Code section 11517, subdivision (d). (All subsequent references are to the Government Code unless otherwise indicated.) We disagree.
 

 Division 3 of the Government Code outlines procedures for administrative adjudication. Under section 11517, subdivision (b), an ALJ must prepare “within 30 days after the case is submitted a proposed decision in such form that it may be adopted as the decision in the case.” The Board then has three
 
 *347
 
 choices. It may adopt the proposed decision in its entirety, it may reduce the proposed penalty and adopt the balance of the proposed decision, or it may reject the ALJ’s proposed decision. (§ 11517, subds. (b), (c).)
 

 Section 11517, subdivision (c), provides: “If the proposed decision is not adopted . . . , the agency itself may decide the case upon the record, including the transcript, with or without taking additional evidence, or may refer the case to the same administrative law judge to take additional evidence. By stipulation of the parties, the agency may decide the case upon the record without including the transcript. . . . The agency itself shall decide no case provided for in this subdivision without affording the parties the opportunity to present either oral or written argument before the agency itself.”
 

 Subdivision (d) of the statute sets forth two 100-day time limitations. First, “[t]he proposed decision shall be deemed adopted by the agency 100 days after delivery to the agency by the Office of Administrative Hearings, unless within that time the agency commences proceedings to decide the case upon the record, including the transcript, or without the transcript where the parties have so stipulated, or the agency refers the case to the administrative law judge to take additional evidence.” (§ 11517, subd. (d).) Second, the agency must issue its decision within 100 days of submission of the case; when the agency has ordered a transcript of the proceedings, the 100-day period begins to run upon delivery of the transcript.
 
 [1]
 

 (Ibid.)
 

 It is this first 100-day period that is at issue in this appeal. Plaintiff contends the Board did not “commence proceedings” within 100 days of delivery of the ALJ’s proposed decision, and therefore the proposed decision must be deemed to have been adopted. We conclude otherwise.
 

 The Board received the ALJ’s proposed decision on January 19, 1994, thereby setting the 100th day on April 29th 1994. On March 23, 1994, the Board issued its notice of nonadoption, rejecting the proposed decision and informing the parties that the “Board itself will now decide the case upon the record, including the transcript.” The Board claims that on the previous day, it made a telephonic request for the administrative record to be prepared. The next day it sent a confirming written request to the Office of Administrative Hearings (OAH) to prepare a transcript in this case. However, the new employee handling the matter mistakenly sent this written request to the Attorney General’s Office instead of OAH. The Board asserted it called OAH on at least three occasions between March 23, 1994, and May 17,
 
 *348
 
 1994, to check on the status of its request for transcripts. On May 17, 1994, after the 100 days had expired, the Board called OAH to check on its order for transcripts and learned that OAH had never received such a request. The Board immediately faxed a duplicate request.
 

 Plaintiff contends the Board cannot be deemed to have “commenced proceedings” until it requested transcripts on May 17, 1994. That date is after the expiration of the 100-day period, leading plaintiff to assert that the ALJ’s proposed decision must be deemed to have already taken effect by operation of law. The parties devote considerable energy to the question of when transcripts were actually ordered and when OAH knew of this request. This dispute is immaterial because it is clear that the Board “commenced proceedings” when it issued the notice of nonadoption and election to decide the case itself upon record, including the transcript, on March 23, 1994, a date well within the 100-day period.
 
 [2]
 

 The proper interpretation of a statute presents a question of law, and we therefore exercise our independent judgment in reviewing this matter.
 
 (Burden
 
 v.
 
 Snowden
 
 (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) “The rules governing statutory construction are well settled. We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] ‘In determining intent, we look first to the language of the statute, giving effect to its “plain meaning.” ’ [Citations] Although we may properly rely on extrinsic aids, we should first turn to the words of the statute to determine the intent of the Legislature. [Citation.] Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.”
 
 (Ibid.)
 

 “If the statutory language is clear and unambiguous, there is no need for construction.”
 
 (Viking Pools, Inc.
 
 v.
 
 Maloney
 
 (1989) 48 Cal.3d 602, 606 [257 Cal.Rptr. 320, 770 P.2d 732].) “Despite the general rule that ambiguity is a condition precedent to interpretation, the literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in light of the statute’s legislative history, appear from its provisions considered as a whole.”
 
 (East Peninsula Ed. Council, Inc.
 
 v.
 
 Palos Verdes Peninsula Unified School Dist.
 
 (1989) 210 Cal.App.3d 155, 166 [258 Cal.Rptr. 147].)
 

 Section 11517, subdivision (d), provides in relevant part: “The proposed decision shall be deemed adopted by the agency 100 days after
 
 *349
 
 delivery to the agency by the Office of Administrative Hearings, unless within that time the agency
 
 commences proceedings to decide the case upon the record,
 
 including the transcript, or without the transcript where the parties have so stipulated, or the agency refers the case to the administrative law judge to take additional evidence.” (Italics added.)
 

 What does it mean to “commence proceedings to decide the case upon the record”? According to plaintiff, an agency cannot be deemed to have commenced proceedings until it has ordered a transcript of the administrative hearing and, implicitly, OAH has received that request. We disagree. An agency commences proceedings to decide the case upon the record when it issues a notice of nonadoption informing the parties that the ALJ’s proposed decision will not be adopted and that it will decide the case itself upon the record rather than referring the case back to the ALJ to take additional evidence.
 

 The language of section 11517 is clear. To “commence” proceedings is to “begin” them. (Webster’s New Collegiate Diet. (9th ed. 1984) p. 264.) An agency begins proceedings to decide a case itself by rejecting the ALJ’s proposed decision or, in the jargon of the field, “nonadopting” it and by electing to decide the case itself upon the record. The act of ordering a transcript of the administrative proceedings follows this initial determination. Indeed, there is no point in ordering a transcript if the board intends to adopt the ALJ’s decision or if the Board decides to refer the case back to the ALJ for additional evidence. Thus, the first step in commencing proceedings to decide a case is the agency’s issuance of a notice of nonadoption and its election to decide the case itself on the record.
 

 Here, the Board took such action on March 23, 1994. In its notice of nonadoption of proposed decision, the Board informed the parties that it had “voted not to adopt the Proposed Decision recommended in this case,” and would instead decide the case itself upon the record, including the transcript. The notice instructed the parties how to order copies of the transcript, and noted: “After the transcript has been prepared, the Board will send you notice of the deadline date to file your written argument. Your right to argue on any matter is not limited. The Board is particularly interested i[n] arguments as to why the penalty contained in the proposed decision should not be reconsidered.”
 

 The notice further advised: “In addition to written argument, oral argument may be scheduled if any party files with the Board within 20 days from the date of this notice, a written request for oral argument. If a timely request is filed, the Board will serve all parties with written notice of the time, date
 
 *350
 
 and place of hearing.[
 
 3
 
 ]Please remember to serve the opposing party with a copy of your written argument and any other papers you might file with the Board.”
 

 Thus, this notice served several functions. It informed the parties that the ALJ’s proposed decision would not be adopted and that the Board itself would decide the case upon the record, the first step to begin proceedings. It also instructed the parties how to order transcripts, focused the parties’ attention on the central matter of concern to the Board for purposes of submitting written briefs, and gave the parties 20 days to request oral argument. Clearly this notice served to “commence
 
 [4]
 

 This interpretation comports with the salutary purposes of the time limitations contained in section 11517. Prior to 1980, section 11517 contained no time limitations at all, and an administrative agency had an indefinite period of time in which to act upon an ALJ’s proposed decision. (See Stats. 1971, ch. 653, § 1, pp. 1299-1300.) A licensee might remain in “administrative limbo” for weeks, months, or potentially even years, not knowing whether discipline would be imposed or what that discipline might be. Similarly, without time limits, the public was endangered as licensees continued to practice while consumer complaints remained unresolved.
 

 In 1979, the Legislature incorporated time limits into section 11517, thereby eliminating much of that delay and uncertainty. (Stats. 1979, ch. 199, § 4, pp. 442-443.) Pursuant to these amendments, an ALJ must now issue a proposed decision within 30 days of submission, and within 30 days of the agency’s receipt of that decision, copies must be served on each party. (§ 11517, subd. (b).) The agency has 100 days to accept, reject, or modify the proposed decision. (See § 11517, subds. (b), (c), (d).) If the agency does not “commence proceedings” to decide the case within that time period, the proposed decision is deemed adopted. (§11517, subd. (d).)
 

 
 *351
 
 Our conclusion that “commencing proceedings” means issuing a notice of nonadoption and electing either to decide the case itself or remand it to the ALJ for additional evidence, furthers the concept of timeliness incorporated in this statute. Within 100 days of the agency’s receipt of the ALJ’s proposed decision, a licensee will know whether the agency is adopting or rejecting that decision and if rejected, whether the Board will decide the case itself upon the record or will return the case to the ALJ. “Administrative limbo” and lengthy periods of uncertainty have been eliminated.
 

 Nothing in the language of section 11517, subdivision (d), supports plaintiff’s claim that an agency “commences proceedings” only when a transcript has been ordered. As we have already noted, an agency predicates a request for transcripts on two earlier steps: It must first decide to reject the ALJ’s proposed decision and then it must elect to decide the case itself or remand it. It is these actions, not the ordering of transcripts, that sets the wheels in motion. The act of ordering a transcript does nothing to speed up the administrative process since, as both parties recognize, agencies are under no statutory constraints to prepare a requested transcript within a particular time frame.
 
 [5]
 
 The statute ensures timely action in two ways. First, the agency must issue a notice of nonadoption and elect to decide the case itself or to remand it, thereby commencing proceedings, within 100 days of receipt of the ALJ’s proposed decision.
 
 [6]
 
 Second, the agency must issue its decision within 100 days of receiving the transcripts. Had the Legislature intended to require that a transcript be ordered within the first 100-day period, the statute could easily have been drafted to reflect that fact. No such interpretation can be imputed to the language as it now exists.
 

 In asserting otherwise, plaintiff cites
 
 Outdoor Resorts etc. Owners’ Assn.
 
 v.
 
 Alcoholic Beverage Control Appeals Bd.
 
 (1990) 224 Cal.App.3d 696 [273 Cal.Rptr. 748]
 
 (Outdoor Resorts).
 
 Plaintiff’s reliance is misplaced. In
 
 Outdoor Resorts,
 
 a recreational resort applied for a duplicate clubhouse liquor license which would allow the on-site sale of liquor at a second clubhouse in the project. The application was initially denied, but an ALJ issued a proposed decision holding that the resort was entitled to a duplicate license. The Department of Alcoholic Beverage Control (the Department) rejected the proposed decision and notified the resort that it would decide the matter itself pursuant to section 11517, subdivision (c). The Department subsequently denied the resort’s application. (224 Cal.App.3d at pp. 699-700.)
 

 
 *352
 
 The resort asserted the Department failed to commence proceedings within 100 days after receiving the ALJ’s proposed decision. (224 Cal.App.3d at p. 703.) The Court of Appeal rejected this claim. Noting the ALJ issued his proposed decision on May 3, 1989 (224 Cal.App.3d at pp. 699-700), the court held: “The Department acted well within the 100-day period when on June 29, 1989, it rejected the proposed decision of the ALJ and commenced proceedings to decide the case on the record by ordering a transcript and requesting written arguments.”
 
 (Id.
 
 at p. 703.)
 

 Nothing in
 
 Outdoor Resorts
 
 supports the notion that proceedings commence only when transcripts are ordered. The court simply recounted the steps that had been taken within the 100-day period and, in that particular case, those steps included a request for transcripts. Contrary to plaintiff’s suggestion, the court did not hold or even imply that such an action is a necessary element to commencing the proceedings.
 

 Here, the Board commenced proceedings when it issued its notice of nonadoption and elected to decide the case itself, actions that occurred well within 100 days of the receipt of the ALJ’s proposed decision. The Board’s action was timely under section 11517, subdivision (d).
 
 [7]
 

 II.
 
 Termination of Relationship
 

 In order to assess the propriety of the Board’s decision to revoke plaintiff’s license, we must first review the factual findings of the Board as modified by the trial court. In this appeal, neither plaintiff nor the Board challenges these evidentiary conclusions. We therefore reprint much of the Board’s decision, eliminating those portions the trial court found to be lacking evidentiary support. In making its findings, the Board explicitly stated that when in conflict, the Board had credited the testimony of plaintiff over that of the patient, G.P., whose complaint gave rise to this disciplinary action. The relevant findings of fact are as follows:
 

 “3. [Plaintiff] obtained a BA in Psychology in 1962 from Mills College. She received an MA in clinical psychology in 1977 from the California School of Professional Psychology. [Plaintiff] was awarded a Ph.D. in professional psychology in 1980 from the California School of Professional Psychology. She has been in private practice since 1980.
 

 “4. G.P., a woman who was thirty-two years old at the time, first became [plaintiff’s] patient in July 1988. She and her female lover attended two
 
 *353
 
 conjoint psychotherapy sessions. After these two sessions, G.P. informed [plaintiff] that the other woman did not wish to continue therapy; G.P. then commenced individual psychotherapy.
 

 “5. With the exception of December 1988, G.P. continued in therapy with [plaintiff] until March 2, 1990. She had sessions at least once per week, often with greater frequency.
 

 “6. G.P. sought help with issues of professional and social alienation[. S]he had recently moved from New York and life in Los Angeles had been difficult. She also suffered from depression and post-traumatic stress disorder, having witnessed the violent death of her lover, Danielle, and having suffered other traumatic losses and experiences.
 

 “7. [Plaintiff] felt compassion for G.P. in light of her many setbacks. These feelings grew as therapy progressed and G.P. suffered additional losses and physical afflictions. G.P. told [plaintiff] on several occasions that she (G.P.) felt that [plaintiff] could feel her pain.
 

 “8. The patient was also complimentary of the therapist. Starting as early as September 2, 1988, she told [plaintiff] that she liked her a lot and that she had a good head. She also told [plaintiff] during the period of therapy that she was smart, interesting, and creative; during the same period, G.P. made repeated references to [plaintiff’s] good qualities as a therapist and as a woman.
 

 “9. Some of the patient’s comments contained sexual overtones. Thus, also as early as September 2, 1988, G.P. told [plaintiff] that she wished [plaintiff] were in Paris with her and stated that she wanted to fall in love with a fifty-year old [Fjrench wom[a]n. [Plaintiff was 48 years old at the time. G.P.] told [plaintiff] that she wanted to touch her. She often told [plaintiff] in therapy sessions that she was attractive. (Fn. omitted.)
 

 “10. Early in therapy, [plaintiff] sought to discuss the transference issues revealed by G.P.’s comments. However, the patient refused to discuss the matter and tended to withdraw whenever the subject of her attraction to the therapist was raised. (Fn. omitted.)
 

 “11. G.P. discontinued therapy in the latter part of November. However, she again called [plaintiff] in early January 1989. It was close in time to the anniversary of Danielle’s death and she presented symptoms of severe depression. [Plaintiff] suggested that G.P. continue with therapy. The patient wanted to do so but did not have the financial resources to continue.
 
 *354
 
 [Plaintiff] agreed to defer payment until G.P. was able to pay. Therapy resumed on January 6, 1989.
 

 “12. After January 1989, the number of sessions increased as the patient refused evaluation for medication and hospitalization and [plaintiff] continued to be concerned about the severity of the depression.
 

 “13. In the first three months of 1989, [plaintiff] touched G.P. in an inappropriate manner. On a few occasions, she touched GP’s hand or knee as the patient was experiencing a particularly difficult time. On another occasion, G.P. was very upset and asked if she could put her head on [plaintiff’s] lap; [plaintiff] permitted her to do so. On a separate occasion, G.P. was crying and asked if she could put her head on [plaintiff’s] shoulder, which [plaintiff] allowed; as this happened, [plaintiff] held G.P.’s hand.
 

 “14. GJP.’s condition was improving by the Spring of 1989. Her advances in therapy were supported by the finding of suitable employment as a skin care consultant in a doctor’s office.
 

 . “15. As a gesture of support for her patient, [plaintiff] agreed to visit G.P.’s new place of employment. She now understands that this conduct was inappropriate as it began to blur the boundaries between psychotherapist and patient.
 

 “16. a. The blurring of boundaries continued after the first contact outside of therapy. Although well-intentioned at their inception, each succeeding step moved [plaintiff] toward a personal relationship with the patient and away from an appropriate psychotherapist-patient relationship.
 

 “b. In May 1989, [plaintiff] agreed, again as a supportive gesture, to receive a free facial. The facials continued through the period of psychotherapy.
 

 “c. In order to generate business for G.P., [plaintiff] sent her two daughters to receive facials starting in May 1989. The facials continued until August 1990. G.P. charged a reduced fee during 1989 and no fee in 1990.
 

 “d. In May 1989, G.P. gave [plaintiff] a pedicure.
 

 “e. [Plaintiff] received a free massage on June 26, 1989, at G.P.’s apartment. G.P. wanted to give it to her as a gift and it seemed very important to the patient. [Plaintiff] was undressed and covered with a sheet and no touching of a sexual nature occurred. No other massage was administered by G.P. to [plaintiff] prior to March 2, 1990. G.P. also administered between three and five massages each to [plaintiff’s] daughters.
 

 
 *355
 
 “f. In the summer of 1989, G.P. took care of [plaintiff’s] dog for approximately one week.
 

 “g. In September 1989, [plaintiff] drove G.P. to and from surgery.
 

 “h. In December 1989, G.P. treated [plaintiff] and her older daughter to lunch and to haircuts.
 

 “i. On February 14, 1990, [plaintiff] and her younger daughter had dinner at G.P.’s apartment.
 

 “17. [Plaintiff] did not exchange or barter any therapy services for facials or massages or for any of the items provided by G.P. and set forth in finding of fact number 16.
 

 “18. By September 1989, therapy had shifted focus to G.P.’s physical problems. [Plaintiff] became increasingly involved in assisting G.P. find competent medical care and in helping her deal with her ailments.
 

 “19. In January 1990, G.P. informed [plaintiff] that she had a terminal disease which she was not going to treat in order to avoid undesirable side effects. After this disclosure, [plaintiff’s] compassion for G.P. reached new heights.
 

 “20. As they both realized that their relationship was becoming a personal one, [plaintiff] and G.P. agreed to terminate psychotherapy, which termination occurred on March 2, 1990. No further therapy occurred after March 2, 1990.
 

 “21. [Plaintiff] did not refer G.P. to another therapist after March 2, 1990, for continuing treatment.
 

 “22. During the period prior to March 2, 1990, G.P. initiated several telephonic contacts with [plaintiff.] These discussions occurred several times per week. After March 2, 1990, [plaintiff] and G.P. continued their frequent telephonic dialogue. As before, they discussed issues of concern to G.P., such as her feelings as a result of the loss of Danielle. [Plaintiff] also discussed her personal matters after March 2,1990. [Plaintiff] did not charge G.P. for the telephonic discussions. The phone conversations after March 2, 1990, do not constitute therapy sessions; rather, they are simply phone conversations between friends.
 

 “23. [Plaintiff] did not divulge to her daughters any information obtained from G.P. in therapy.
 

 
 *356
 
 “24. After therapy ended, [plaintiff] and G.P. continued to see each other socially. In addition to talking on the phone and meeting for facials, they went to restaurants, the opera, and other public places.
 

 “25. G.P. insisted on taking [plaintiff] to Europe as a 50th birthday present. She made all the arrangements, including hotel accommodations, and paid for the trip. They departed on September 28, 1990, and returned on October 15, 1990. On the penultimate day of the trip they made love.
 

 “26. Prior to October 1990, [plaintiff] and G.P. had not engaged in sexual intercourse or in any other touching of a sexual nature. [][]•••[']□
 

 “27. After the return from Europe, [plaintiff] and G.P. continued to see each other as lovers. They returned to Europe in February 1991, after which trip G.P. moved into [plaintiff’s] home.
 

 “28. Plaintiff’s] younger daughter did not approve of the relationship between [plaintiff] and G.P. Several heated arguments between the daughter and G.P. followed the disclosure of the relationship. On March 17, 1991, [plaintiff] asked G.P. to move out of her house, as she was no longer able to deal with the conflict between the two and the resulting disruptions.
 

 “29. G.P. left [plaintiff’s] home on March 18, 1991. [Plaintiff] helped G.P. move her belongings to her new home and helped her furnish and fix said place.
 

 “30. [Plaintiff] terminated the relationship in mid-April 1991.
 

 “31. [Plaintiff’s] conduct and the sexual relationship which resulted adversely affected G.P.’s mental and emotional health. She did not intend to harm the patient. Her conduct, however, was reckless and harm to the patient resulted.
 

 “32. [Plaintiff’s] sexual relationship with G.P. evidences poor judgment in a psychotherapy context. Her initial contact with G.P. was as a patient and G.P. continued in therapy for approximately twenty months. [Plaintiff] should have recognized the lingering patient transference. [Plaintiff’s] sexual conduct is therefore substantially related to the qualifications, functions and duties of a psychologist.
 

 “33. [Plaintiff] expressed remorse over her conduct toward G.P. On repeated occasions, she acknowledged her responsibility for her actions and for the harm it brought the patient.
 

 
 *357
 
 “34. a. [Plaintiff] is of a heterosexual orientation. Even before the relationship ended, she began to search for the reasons that led to her sexual involvement with another woman.
 

 “b. She began psychotherapy with Dr. Ernest Bruni ... in 1982. Although the initial goal was professional growth and enhancement, therapy subsequently turned to certain unresolved issues involving the relationship between [plaintiff) and her mother.
 

 “c. At the time in which G.P. came into therapy, [plaintiff] was in the process of addressing the issues pertaining to her relationship with her mother. Accordingly, her defense mechanisms were down, placing her in a vulnerable position. She was also preparing for the departure for college of her two daughters, whom she had raised, sometimes jointly with her ex-husband, since her divorce in 1980. Her own background and the issues she was facing led [plaintiff to over-identify with G.P.’s losses and to need her praise.
 

 “d. Although vulnerable, [plaintiff] recognized the emerging transference problems. However, as she sought to discuss the matter, G.P. became evasive and withdrawn. This pattern of behavior duplicated that of [plaintiff’s] mother when confronted with certain issues. [Plaintiff] resorted to her own familiar response, namely to avoid the difficult issues. In this context, the process of countertransference began to take its course.
 

 “e. The boundary breaches outside of therapy which began in the Spring of 1989 only accelerated the countertransference process, ultimately leading to the sexual relationships with the patient.
 

 “f. In October 1990, soon after her return from the catalytic trip to Europe, [plaintiff] disclosed to her therapist that she was in a sexual relationship with a woman. The process of searching continued and 1 or 2 months later she disclosed that G.P. was a former patient. These disclosures and the discussions which followed ultimately helped [plaintiff] end her relationship with G.P. However, [plaintiff] had not been completely candid with Dr. Bruni, her long-time therapist, as she had not previously disclosed her close social and personal relationship with a patient.
 

 “g. In her therapy with Dr. Bruni [plaintiff] as come to understand the reasons that led to her relationship with G.P. More importantly, she realizes that this understanding does not excuse her behavior. She continues to work with Dr. Bruni, presently 4 times per week, to ensure that she does not commit similar offenses.
 

 
 *358
 
 “h. Dr. Bruni is impressed with [plaintiff’s] progress and does not think it is likely that she will again engage in sexual relations with a patient or a former patient.
 

 “35. [Plaintiff] did not initiate or continue therapy with G.P. knowing that her personal problems or issues may have resulted in the provision of inferior services to her patient.
 

 “36. Dr. Jeffrey N. Younggren . . . , a psychologist who has prepared psychological evaluations for the Board, conducted such an evaluation of [plaintiff] in October and November 1993. He is satisfied that [plaintiff] is competent to practice and that she does not pose a threat to the public.
 

 “. . . He distinguished the two [MMPI II] evaluations by referring to them as the ‘uncorrected response pattern’ and the ‘corrected response pattern.’ ... He further testified that reversing the responses [on four questions] ‘really had substantial affect,’ and that “[t]he uncorrected response patte[r]n, the first one, reflects a more significant level of Axis-I psychopathology. It shows that [plaintiff] is prone to acting out, less inclined to respect the feelings of others.’
 

 “There is no evidence to support the findings based upon the MMPI when responses are reversed, as they were by Dr. Younggren in this matter. The effect of Dr. Younggren’s reversing the responses was to invalidate the test instrument.[
 
 8
 
 ]
 

 “37. a. Concerned that the situation involving G.P. may have adversely affected her work with other patients, [plaintiff] voluntarily sought the supervision of an independent psychologist, Dr. Sherry L. Skidmore .... Since August 1993, [plaintiff] has brought issues and concerns to Dr. Skidmore at regular weekly sessions. These sessions last approximately 1 [-] 1/2 hours and [plaintiff] plans to continue with them. It clearly appears that [plaintiff] sought out Dr. Skidmore only after the instant action was filed against her, and such action is therefore not considered significant evidence of mitigation.
 

 “b. Dr. Skidmore is supportive of [plaintiff’s] rehabilitation efforts. She does not think that [plaintiff] will repeat the sexual misconduct.
 

 “38. Several professionals in the field provided letters and testimony in support of [plaintiff], attesting to her competence as a therapist and to her qualifies as a person.”
 

 
 *359
 
 Based upon these findings, the Board made the following determination of issues:
 

 “1. Cause exists pursuant to Business and Professions Code section 26900) to discipline [plaintiff’s] license in that she was grossly negligent in the practice of her profession, by reason of finding of fact numbers 13, 15, 16, and 21.
 

 “2. Cause exists pursuant to Business and Professions Code sections 726, 29600) and 2960(o) to discipline [plaintiff’s] license in that she had sexual relations with a patient, by reason of finding of fact numbers 25, 27, and 32.[
 
 9
 
 ]
 

 “4. It cannot be said that behavior such as committed by [plaintiff] in the instant case will not recur. [Plaintiff] had been in long-term, continuing therapy with Dr. Bruni and such therapy did not prevent the behavior which is the subject of this action from occurring. Nor was [plaintiff] completely candid with Dr. Bruni, as reflected in finding of fact number 34(h). The results of the ‘uncorrected response pattern’ MMPI-II conducted by Dr. Younggren ‘reflects a more significant level of Axis-I psychopathology. It shows that Dr. Poliak is prone to acting out, less inclined to respect the feelings of others.’
 

 “The public will not be adequately protected under these circumstances if Dr. Poliak is allowed to continue to practice under her license.”
 

 As we just have recounted, the Board found that the professional relationship between plaintiff and G.P. terminated on March 2,1990. It was not until October 1990, some seven months later, that plaintiff and G.P. engaged in sexual relations for the first time. Prior to this time the Board determined
 
 *360
 
 that plaintiff and G.P. “had not engaged in sexual intercourse or in any other touching of a sexual nature.” Despite these findings, the Board ruled that cause for discipline existed under Business and Professions Code sections 726 and 2960, subdivisions (j) and (o), because plaintiff “had sexual relations with a patient, by reason of finding of fact numbers 25, 27, and 32."
 

 Plaintiff contends she “was not practicing psychology in regard to patient G.P. after March 2, 1990, [because] G.P. was not Dr. Poliak’s patient after March 2.” The Board retorts that the term “patient” in Business and Professions Code sections 726 and 2960, subdivision (o), includes a former patient. In its view, “ ‘once a patient, always a patient.’ ” Plaintiff has the better argument.
 

 As we have already recounted, our analysis must start “from the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] In determining intent, we look first to the words themselves. [Citation.] When the language is clear and unambiguous, there is no need for construction. [Citations.] When the language is susceptible of more than one reasonable interpretation, however, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporary administrative construction, and the statutory scheme of which the statute is a part.”
 
 (People
 
 v.
 
 Woodhead
 
 (1987) 43 Cal.3d 1002, 1007-1008 [239 Cal.Rptr. 656, 741 P.2d 154].) Moreover, where possible, significance should be given to every word and phrase.
 
 (Seidler
 
 v.
 
 Municipal Court
 
 (1993) 12 Cal.App.4th 1229,1234 [16 Cal.Rptr.2d 90].) Consequently, “constructions which render some words surplusage . . . are to be avoided.”
 
 (California Mfrs. Assn.
 
 v.
 
 Public Utilities Com.
 
 (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].)
 

 The principal statutory scheme governing revocation of a psychologist’s license is found in the psychology licensing law in article 4 of chapter 6.6 of division 2 of the Business and Professions Code. (Bus. & Prof. Code, § 2901.) Section 2960 of that code sets forth the grounds for which the Board may revoke a psychologist’s license. At the time of the events in question in this case, subdivision (o) of that section listed the following ground for discipline: “Any act of sexual abuse, or sexual relations with a patient, or sexual misconduct which is substantially related to the qualifications, functions or duties of a psychologist or psychological assistant.” (Stats. 1992, ch. 1099, § 2.)
 

 
 *361
 
 Neither the psychology licensing law nor the regulations adopted by the Board define the term “patient.”
 
 [10]
 
 But the term “patient” is a common, nontechnical word. As such, “[w]e are required to give effect to statutes ‘according to the usual, ordinary import of the language employed in framing them.’ ”
 
 (Moyer
 
 v.
 
 Workmen’s Comp. Appeals Bd.
 
 (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) Under ordinary definitions, a patient is “an individual awaiting or under medical care and treatment.” (Webster’s New Collegiate Diet. (1977) p. 840.) So defined, G.P. was not plaintiff’s patient at the time the parties engaged in the sexual acts.
 

 The Board counters that in order to advance the legislative purpose in regulating the practice of psychology to protect the public, “the transference phenomenon that develops in therapeutic relationships, the continuing professional responsibilities of a therapist, and other significant factors must be considered.” Noting the well-known transference phenomenon and citing Gabbard and Pope, Sexual Intimacies After Termination: Clinical, Ethical and Legal Aspects, Sexual Exploitation in Professional Relationships (Am. Psychiatric Press 1989), the Board emphasizes that “the mere termination of therapy to have sex with a patient does not cause the transference phenomena to suddenly or automatically disappear.” The Board further notes that some duties to patients, such as the obligations concerning confidentiality and the psychologist-patient privilege, continue after the professional relationship is formally terminated. Finally, the Board argues that the term “patient” should be broadly construed so that selfish, unethical and unprofessional psychologists cannot circumvent the law and “expose multiple recently-terminated patients to the great risk of harm inherent in psychotherapist-patient sex, without fear of license discipline.”
 

 The fact that some duties continue after the formal relationship has ended does not shed any light on the issue before us. The psychotherapist-patient privilege, for example, relates to “confidential communications,” namely “information, including information obtained by an examination of the patient, transmitted between a patient and his psychotherapist
 
 in the course of that relationship
 
 and in confidence by a means which, so far as the patient is aware, discloses the information to no third persons other than those who are present to further the interest of the patient in the consultation, or those
 
 *362
 
 to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the psychotherapist is consulted, and includes a diagnosis made and advice given by the psychotherapist in the course of that relationship.” (Evid. Code, § 1012, italics added; see also § 2918.) Thus, the privilege concerns confidential communications between the patient and psychotherapist
 
 during
 
 their professional relationship. The fact that the privilege continues after the termination of the relationship has no bearing on the issue under review. We are concerned here with an event that occurred after the termination of the relationship, not during it. After termination, a communication between a former patient and the psychotherapist would not constitute a privileged communication under the statute.
 

 Moreover, despite the Board’s arguments, it is clear that the Legislature has drawn a distinction between patients and former patients for purposes of licensure discipline. In 1994, after the events in this case, the Legislature enacted Business and Professions Code section 2960.1. It provides that “ Notwithstanding Section 2960, any proposed decision or decision issued under this chapter . . . that contains any finding of fact that the licensee or registrant engaged in any act of sexual contact, as defined in Section 729, when that act is with a patient,
 
 or with a former patient when the relationship was terminated primarily for the purpose of engaging in that act,
 
 shall contain an order of revocation. The revocation shall not be stayed by the administrative law judge.” (Stats. 1994, ch. 1274, § 1.8, italics added.) This disciplinary statute, by its very terms, distinguishes between a patient and a former patient. If the Board’s interpretation were correct, there would be no need for the Legislature to use the term “former” to describe a patient or add the qualification that the relationship must have been terminated primarily for the purpose of engaging in sexual contact.
 

 This distinction between a patient and a former patient was also drawn by the Legislature when it enacted Civil Code section 43.93. This statute declares that “[a] cause of action against a psychotherapist for sexual contact exists for a patient or
 
 former patient
 
 for injury caused by sexual contact with the psychotherapist, if the sexual contact occurred under any of the following conditions: [*][] (1) During the period the patient was receiving psychotherapy from the psychotherapist. [<¡0 (2) Within two years following termination of therapy. FJQ (3) By means of therapeutic deception.” (Civ. Code, § 43.93, subd. (b).) The same distinction was drawn by the Legislature when it enacted Business and Professions Code section 729 in 1989 making it a crime for a psychotherapist to engage in sexual exploitation. Under this penal statute, any psychotherapist who engages in the forbidden sexual conduct “with a patient or client, or with a former patient or client when the
 
 *363
 
 relationship was terminated primarily for the purpose of engaging in those acts" is guilty of a crime. (Bus. & Prof. Code, § 729, subd. (a).)
 

 The Board retorts that drawing such a distinction between patients and former patients “would mean that a therapist who has sex with a former patient could be criminally punished and civilly liable for conduct that cannot be a basis for discipline by a licensing board.” The claim is overblown. Under subdivision (a) of Business and Professions Code section 2960, “[c]onviction of a crime substantially related to the qualifications, functions or duties of a psychologist" constitutes grounds for discipline. Moreover, under the new statute dealing with sexual contact with former patients, the Board is both empowered and directed to revoke the license of the offending psychotherapist.
 

 Given these enactments drawing a clear line between patients on the one hand and former patients on the other, we conclude that the term “patient” in Business and Professions Code section 2960, subdivision (o), referred to a person presently under the care of a psychotherapist and not to a former patient.
 

 We reach the same result with respect to Business and Professions Code former section 726. At the time of these events, this section read: “The commission of any act of sexual abuse, misconduct, or relations with a patient, client, or customer which is substantially related to the qualifications, functions, or duties of the occupation for which license was issued constitutes unprofessional conduct and grounds for disciplinary action . . . .” (Stats. 1983, ch. 928, § 1, p. 3345.) But once again, in the same statutory scheme, the Legislature has drawn a distinction between a patient and a former patient. Thus, Business and Professions Code section 729, subdivision (a), provides in relevant part: “Any . . . psychotherapist . . . who engages in an act of sexual intercourse, sodomy, oral copulation, or sexual contact with a patient or client, or with a
 
 former
 
 patient or client when the relationship was terminated primarily for the purpose of engaging in those acts, unless the . . . psychotherapist, . . . has referred the patient or client to an independent and objective . . . psychotherapist, . . . recommended by a third-party . . . psychotherapist... for treatment, is guilty of sexual exploitation by a . . . psychotherapist. . . .” (Italics added.)
 

 Finally, the Board argues that plaintiff’s admission that she violated these statutes in the manner charged constitutes direct proof of violations and amounts to a waiver of any statutory challenge to the statutes. The argument is unconvincing. Although plaintiff did make a number of factual admissions, she did not admit that she engaged in sexual conduct with G.P. prior
 
 *364
 
 to the termination of their professional relationship. The Board counters that as a result of plaintiff’s admissions and stipulation, the ALJ barred the introduction of expert testimony on the ongoing ethical and professional responsibilities of a therapist to a patient. The Board claims it would be prejudiced if we decided this issue without a full record. We disagree. The question is whether, at the time of these events, sexual relations with a former patient were a ground for discipline under Business and Professions Code former section 726 and section 2960, subdivision (o). That question is a purely legal one, not a factual question to be addressed with testimonial evidence.
 

 Given our reading of the relevant statutes, it follows that the Board erred in determining that cause existed to discipline plaintiff’s license because she had sexual relations with a patient.
 

 There is considerable doubt whether the Board would have revoked plaintiff’s license had it not erroneously found that she had engaged in sexual relations with a patient. In this circumstance, a remand to the Board for reconsideration of the penalty is the appropriate procedure. “It is well settled, of course, that in cases involving the imposition of a penalty or other disciplinary action by an administrative body, when it appears that some of the charges are not sustained by the evidence, the matter will be returned to the administrative body for redetermination in all cases in which there is a ‘real doubt’ as to whether the same action would have been taken upon a proper assessment of the evidence.”
 
 (Miller
 
 v.
 
 Eisenhower Medical Center
 
 (1980) 27 Cal.3d 614, 635 [166 Cal.Rptr. 826, 614 P.2d 258].) In light of this disposition, we have no occasion to consider plaintiff’s contention that the Board otherwise abused its discretion in revoking her license to practice psychology.
 

 Disposition
 

 The judgment is reversed with directions to issue a peremptory writ of mandate directing the Board to set aside its decision revoking plaintiff’s license and redetermine the discipline to be imposed in light of this opinion. Plaintiff shall recover her costs on appeal.
 

 Blease, Acting P. J., and Scotland, J., concurred.
 

 A petition for a rehearing was denied May 23, 1997, and respondent’s petition for review by the Supreme Court was denied July 16, 1997.
 

 [1]
 

 Under special circumstances, the agency may delay its decision for a period of no more than 30 days. (§ 11517, subd. (d).)
 

 [2]
 

 The trial court found “that the Board ordered the preparation of the administrative record by multiple phone calls placed to OAH. Such phone calls, coupled with the formal nonadoption of the PD [proposed decision] and notification of such to petitioner [plaintiff], constitute compliance with the statute’s requirement that proceedings be ‘commenced’.”
 

 [3]
 

 Oral argument was held in this case. Although the record does not contain the parties’ requests for oral argument, presumably the parties filed their requests for such a hearing within 20 days of March 23, 1994, the date of the notice of nonadoption.
 

 [4]
 

 In 1995, the Legislature amended section 11517. Effective July 1, 1997, section 11517, subdivision (d), adds the following italicized language to provide that the proposed decision shall be deemed adopted unless within 100 days “the agency
 
 notifies the parties that the proposed decision is not adopted. . . and
 
 commences proceedings to decide the case upon the record, . . .” (Stats. 1995, ch. 938, § 42.) Although this amendment is not yet in effect, it is consistent with our construction of the present statute. The agency must notify the parties that the proposed decision is rejected and then commence the proceedings by electing either to decide the case upon the record or to refer it back to the ALJ for further evidence. These decisions commence the proceedings, and the necessary implementing steps, such as ordering the transcripts or returning the case documents to the ALT, are merely administrative acts to carry out those commencing decisions.
 

 [5]
 

 The administrative record, including the transcript, is usually prepared within 60 to 90 days of request. (Cal. Admin. Hearing Practice (Cont.Ed.Bar 1984) Administrative Decision and Review, § 4.19, p. 229.)
 

 [6]
 

 As one leading commentator notes, “an agency has 100 days under the statute to decide whether or not to reject the proposed decision, and decide the case itself.” (1 Ogden, Cal. Public Agency Law Practice (1992 rev.) § 40.04[3][c], p. 40-11.)
 

 [7]
 

 Given this conclusion, we have no occasion to resolve the parties’ dispute over whether the time limits specified in this statute are mandatory or directory.
 

 [8]
 

 The trial court noted, however, Dr. Younggren’s evaluation was based on 12 hours of personal interviews and that Younggren had testified his prognosis would be the same for plaintiff with or without the MMPI-II test results.
 

 [9]
 

 At the time of events in question, Business and Professions Code section 726 read in relevant part: “The commission of any act of sexual abuse, misconduct, or relations with a patient, client, or customer which is substantially related to the qualifications, functions, or duties of the occupation for which a license was issued constitutes unprofessional conduct and grounds for disciplinary action . . . .” (Stats. 1983, ch. 928, § 1, p. 3345.) Business and Professions Code section 2960, subdivisions (j) and (o), provided at the relevant times: “The Board may order the denial of an application for licensure, or issue a license with terms and conditions, or, as to any licensee, order the suspension for a period not exceeding one year, or the revocation of, or the imposition of probationary conditions upon, a licensee for any of the following causes: [<1 . . . fiD (j) Being grossly negligent in the practice of his or her profession. fi|] ... HD (°) Any act of sexual abuse, or sexual relations with a patient, or sexual misconduct which is substantially related to the qualifications, functions or duties of a psychologist or psychological assistant.” (Stats. 1992, ch. 1099, § 2.)
 

 [10]
 

 It does, however, define the practice of psychology “as rendering or offering to render for a fee to individuals, groups, organizations or the public any psychological service involving the application of psychological principles, methods, and procedures of understanding, predicting, and influencing behavior, such a the principles pertaining to learning, perception, motivation, emotions, and interpersonal relationships; and the methods of procedures of interviewing, counseling, psychotherapy, behavior modification, and hypnosis; and of constructing, administering, and interpreting tests of mental abilities, aptitudes, interests, attitudes, personality characteristics, emotions, and motivations.” (Bus. & Prof. Code, § 2903.)