[No. C027404. Third Dist. Feb. 28, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
HARVEY MACK LEONARD, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976, this opinion is certified for publication with the exception of parts I, II, V to X, and XII of the Discussion.

## COUNSEL

Kenneth H. Nordin, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Stan Cross and Janet E. Neeley, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CALLAHAN, J.**—Defendant Harvey Mack Leonard appeals from an order committing him to Atascadero State Hospital after a jury found true the allegation he is a sexually violent predator within the meaning of Welfare and Institutions Code sections 6600-6609.3, the Sexually Violent Predators Act (the SVPA).[1]

Defendant raises a broad constitutional challenge to the SVPA, claiming it violates guarantees of due process, equal protection, fair trial, right to counsel, the privilege not to testify against himself, and protections against double jeopardy and ex post facto laws. Most of defendant's constitutional arguments were rejected by the California Supreme Court in *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138 [81 Cal.Rptr.2d 492, 969 P.2d 584] (hereafter *Hubbart*), and by this court in *People v. Buffington* (1999) 74 Cal.App.4th 1149 [88 Cal.Rptr.2d 696]. One claim of instructional error calls into question the 1977 qualifying conviction. We affirm the commitment order.

### FACTUAL AND PROCEDURAL BACKGROUND

In March 1997, the Placer County District Attorney filed a petition for defendant's involuntary treatment as a sexually violent predator (SVP). The petition alleged defendant had been convicted of a sexually violent offense against two victims: (1) a February 1987 Placer County conviction of forcible rape and penetration with a foreign object (Pen. Code, §§ 261, former subd. (2), now subd. (a)(2), & 289); and (2) an August 1977 Sacramento County conviction of forcible rape by force or fear (Pen. Code, § 261, former subd. (2), now subd. (a)(2)).

The court overruled defendant's demurrer challenging the constitutionality of the SVPA. Jury trial commenced on August 6, 1997. The district attorney called as expert witnesses four licensed clinical psychologists: Elaine Finnberg, David Stubbins, Melvin Macomber, and Philip Trompetter. All four testified that defendant met the criteria for designation as a SVP. Each described him as exhibiting two mental disorders: (1) paraphilia, rape, or sexual sadism; and (2) antisocial personality disorder. At trial, Finnberg and Stubbins described facts which led to their diagnoses.

The 1987 qualifying conviction involved a 17-year-old girl who had a friend living in the house rented by defendant. Defendant gave the victim a ride to a party. At some point during the evening, defendant drove her to a

---

[1]All undesignated statutory references are to the Welfare and Institutions Code.

rural area, and told her he wanted "some pussy." The victim tried to run from defendant's car, but he chased her, grabbed her by the hair, and threw her onto the grass by the roadside. Threatening to harm the victim, defendant retrieved a wooden club from his car. He forced her into the cargo section of the car, pulled down her jeans and underwear, inserted his finger into her vagina, attempted oral sex, then raped her. He said he would hurt her if she told anyone what had happened. After the victim reported the rape, defendant stated the victim was a "loose girl," and that the sex was consensual. Later he said it was "date rape." At the hearing to determine whether he was a SVP, defendant claimed the 17-year-old was a "bag whore" who was prostituting herself to obtain money for drugs. Defendant was paroled after serving nine years of a 16-year sentence. Upon release, he failed to register as a convicted sex offender, and moved without informing his parole officer. Defendant was arrested for driving under the influence, and returned to prison after the court revoked parole in August 1996.

The 1977 qualifying conviction involved the rape of a 16-year-old girl defendant kidnapped from a bus stop in Sacramento County. He drove the victim to a rural location, choked her, hit her, ripped off her panties, and forced his penis into her face in an attempt at oral copulation. Then defendant raped her. Although he pleaded guilty in the resulting prosecution, defendant later claimed the victim was a prostitute who was angry at him because he did not pay what she demanded. He repeated this claim at the section 6600 hearing. Defendant served 40 months for these offenses, and was paroled in September 1980. In August 1981, defendant was charged with attempted rape. The court revoked parole in lieu of trial on that charge.

Defendant's brief omits reference to the two psychologists' description of other crimes committed by defendant between 1976 and 1985 which also provided the basis for their expert opinions. In November 1976, a 19-year-old woman accepted a ride from defendant, whom she had met through a friend. Defendant followed the woman into her apartment, threw her on a bed, choked her, and hit her in the face with his fist. Friends responded to the victim's screams, and ordered defendant to leave. Defendant was charged with robbery and assault to commit rape. Those charges were subsequently dismissed, and he was convicted of assault with a deadly weapon.

An incident in March 1977 involving a 22-year-old woman resulted in charges of attempted rape. The victim claimed defendant had raped many women, but they refused to come forward or dropped charges when he threatened to kill them. She said defendant told her specifically that he would kill her if she testified against him. The record suggested the case was dismissed in 1977 at a time other charges were pending.

In December 1980, in an uncharged case, defendant gave the female victim a ride. He parked in a remote area and said he was going to rape her. The victim managed to flee the car after stabbing defendant on the hand. He dragged her back, and forced her to orally copulate him.

Another incident occurred in June 1983, when defendant kidnapped a 26-year-old woman from a Reno parking lot at knifepoint. He drove her to a rural area, digitally penetrated her anus and vagina, attempted to sodomize her, and forced her to orally copulate him after he was unable to obtain an erection. At a subsequent trial, the victim testified defendant said he would kill her. He told her he had already killed a girl in California, and could not return there.

In a second 1983 incident, defendant gave a ride to a 20-year-old woman, and drove her to his house. After forcing the victim inside, he rammed her against the wall, ripped her clothes, raped her, and threatened harm if she told her mother about the rape.

In October 1985, defendant was convicted of assault with a deadly weapon and kidnapping in a case involving an Alameda County woman. The court dismissed a charge of assault with intent to rape in the course of the criminal proceedings. The victim had known defendant for about a year, having bought a car from him. She accepted a ride in defendant's van, where he forced her to orally copulate him. The victim then picked up defendant's pocket knife, and attempted to escape. An altercation ensued in which she bit him on the leg. Defendant forced her back into the van with a claw hammer. When he raised the claw hammer to hit the victim, she stabbed him with the pocket knife. Defendant drove himself to a hospital, where he initially claimed to have been attacked during a robbery. In the course of the medical evaluation, he admitted to being stabbed by the victim, but claimed her attack was motivated by jealousy.

DISCUSSION

I, II*

. . . . . . . . . . . . . . . . . . . . . . . . .

III

*Defendant's Representation at Trial*

Defendant raises two constitutional issues involving his representation at trial. The SVPA specifically provides that a person subject to commitment is

*See footnote, *ante*, page 776.

entitled to the assistance of counsel. "In the case of a person who is indigent, the court shall appoint counsel to assist him . . . ." (§ 6603, subd. (a).)

Given the liberty interests involved, we assume for purposes of argument that individuals subject to the SVPA deserve the same constitutional protections accorded criminal defendants. (Cf. *Specht v. Patterson* (1967) 386 U.S. 605, 609-610 [87 S.Ct. 1209, 1212-1213, 18 L.Ed.2d 326, 329-330]; *People v. Burnick* (1975) 14 Cal.3d 306, 324-325 [121 Cal.Rptr. 488, 535 P.2d 352]; & *Estate of Bodger* (1954) 128 Cal.App.2d 710, 714 [276 P.2d 83].) ▮ A criminal defendant is entitled to assistance of counsel at all critical stages of the proceeding. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; Pen. Code, §§ 686, 859 & 987; *Gideon v. Wainwright* (1963) 372 U.S. 335, 344-345 [83 S.Ct. 792, 796-797, 9 L.Ed.2d 799, 805-806, 93 A.L.R.2d 733].) He or she may discharge appointed counsel and substitute another attorney by successfully demonstrating inadequate representation. (*People v. Marsden* (1970) 2 Cal.3d 118, 124-125 [84 Cal.Rptr. 156, 465 P.2d 44] (hereafter *Marsden*).) Due process also secures the right of a criminal defendant to appear and defend with retained counsel of his or her own choice. However, this right is not absolute, and the court may exercise discretion to ensure orderly and expeditious judicial administration if the defendant is "unjustifiably dilatory or . . . arbitrarily desires to substitute counsel at the time of trial." (*People v. Blake* (1980) 105 Cal.App.3d 619, 623-624 [164 Cal.Rptr. 480].) A criminal defendant also has an unconditional constitutional right to represent himself or herself if, on timely motion, the trial court determines defendant has voluntarily and intelligently elected to do so. (*People v. Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187], citing *Faretta v. California* (1975) 422 U.S. 806, 836 [95 S.Ct. 2525, 2541-2542, 45 L.Ed.2d 562, 582] (hereafter *Faretta*).)

Defendant argues the court violated his constitutional and statutory rights to counsel by: (1) failing to provide a *Marsden* hearing on the first day of trial; and (2) coercing him to represent himself during jury selection. We conclude there was no constitutional or statutory violation in this case.

## A. *Trial Proceedings:*

Public Defender David Brooks appeared on behalf of defendant on the first day of trial. Brooks immediately explained that he was fired, and defendant was "choosing not to speak to [him.] First, I would take that as a Feretta [*sic*] motion; and second, I would possibly take that as a Marsden, . . ." On questioning, the court learned that defendant objected to being chained and was angry about Brooks's report of finding metal-tipped darts in a bag of clothing defendant's wife had attempted to give her husband

the day before. The court explained Brooks was required as an officer of the court to report the presence of a possible weapon.

Defendant reiterated that he did not want Brooks, but complained he could not represent himself while chained. He asked the court to appoint "conflict counsel." The court denied the request as untimely, and told defendant that his choices were to proceed with Brooks, or represent himself. It then advised defendant of his rights regarding self-representation. In response to a question whether Brooks had gone over the allegations against him, defendant responded: "No, your Honor, I haven't spoken about 30 minutes with Mr. Brooks in the last four months together. That's a total." Brooks acknowledged they had discussed potential defenses and nothing more.

Defendant repeated he was being "kangerooed," and forced to defend himself. The court denied as untimely a request for continuance to obtain counsel. Both the court and the prosecution suspected defendant was seeking ways to delay the proceedings. Defendant reaffirmed that Brooks was no longer his attorney, and the court informed defendant he was "in a position at this time of representing himself."

Before departing, Brooks stated, "The Court didn't technically have a [Marsden] motion. I don't know if he technically asked for one either, but my client seems to be alleging some form of [ineffective assistance of counsel] that I'm not quite sure I understand at this point, but that seems to be the allegation. If that were true, then he would have the right to court-appointed counsel and over the People's objection, he is probably entitled to a continuance to let counsel be prepared for him if I, in fact, committed [ineffective assistance of counsel]. I don't think I did, but the Court did not exclude the prosecutor and actually have the Marsden hearing. Although, maybe we sort of did if Mr. Leonard ended up venting all the concerns that he had."

The court stated for the record that defendant had taken the opportunity to express "his concerns regarding the arm band and the chains and that sort of thing, and I think he vented his concerns about [Brooks's] participating in reporting the incident with the darts."

Defendant requested a continuance to review the reports and other material in Brooks's possession "and prepare [himself] for trial." Brooks made plans to provide defendant with those documents. The court denied the request for continuance. At the same time the court indicated it would conduct jury selection that day and not begin the presentation of evidence until the following morning to give defendant time to review the material received from Brooks.

Defendant, wearing shackles, represented himself at the ensuing jury selection. During voir dire, defendant asked one prospective juror to be his attorney; he asked another whether he or she liked country music. At times, defendant spoke so softly prospective jurors had trouble hearing him. Others expressed their annoyance after defendant explained he spoke softly to make sure everyone was paying attention and able to hear. Two prospective jurors expressed antagonism toward defendant, and thought he was making a mistake representing himself.

The court reappointed Brooks to represent defendant at the start of the second day of trial. Brooks moved for mistrial "based upon an ineffective representation and participation in the jury selection process." The court denied the motion. It noted defendant exercised three or four peremptory challenges out of the 10 allowed, and all the jurors selected stated they could give both sides a fair trial.

B. *Failure to Hold Marsden Hearing:*

■ Defendant asserts the court erred in refusing to appoint counsel to replace Brooks without conducting further inquiry outside the district attorney's presence. He argues the court should have followed up on the comment Brooks spent only 30 minutes communicating with him during the four months before trial.

■ "[T]he decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney." (*Marsden, supra,* 2 Cal.3d at p. 123.) " 'When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations].' " (*People v. Fierro* (1991) 1 Cal.4th 173, 204 [3 Cal.Rptr.2d 426, 821 P.2d 1302], quoting *People v. Crandell* (1988) 46 Cal.3d 833, 854 [251 Cal.Rptr. 227, 760 P.2d 423]; see also *Marsden, supra,* 2 Cal.3d at pp. 124-125.) However, "a defendant may not force the substitution of counsel by his own conduct that manufactures a conflict." (*People v. Smith* (1993) 6 Cal.4th 684, 696 [25 Cal.Rptr.2d 122, 863 P.2d 192].)

■ *Marsden* explains that "the trial court [judge] cannot thoughtfully exercise its discretion in this matter without listening to [defendant's] reasons for requesting a change of attorneys. A trial judge is unable to intelligently deal with a defendant's request for substitution of attorneys unless he is cognizant of the grounds which prompted the request. The defendant may have knowledge of conduct and events relevant to the diligence and competence of his attorney which are not apparent to the trial judge from observations within the four corners of the courtroom. . . . Thus, a judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney. A judicial decision made without giving a party an opportunity to present argument or evidence in support of his contention 'is lacking in all the attributes of a judicial determination.' [Citation.]" (*Marsden, supra*, 2 Cal.3d at pp. 123-124.) "Failure to inquire adequately into a defendant's complaints results 'in a silent record making intelligent appellate review of defendant's charges impossible.' [Citation.]" (*People v. Hill* (1983) 148 Cal.App.3d 744, 755 [196 Cal.Rptr. 382].)

At the same time, there is no obligation to initiate the *Marsden* inquiry sua sponte. A trial court's duty to conduct the inquiry arises "*only when the defendant asserts directly or by implication* that his counsel's performance has been so inadequate as to deny him his constitutional right to effective counsel." (*People v. Molina* (1977) 74 Cal.App.3d 544, 549 [141 Cal.Rptr. 533], italics added.)

■ The question here is whether defendant's request for substitution of counsel after Brooks reported the darts in the bag delivered by defendant's wife was sufficient to raise the issue of Brooks's competence as counsel. Brooks acknowledged at the time that it was not technically a *Marsden* motion, but argued his former client seemed to be alleging some form of ineffective assistance. The court expressly found defendant had vented all his concerns. The lengthy discussion was sufficient to show defendant's unhappiness with Brooks was not based on his competence as an attorney. We cannot say on this record that the court had a duty to conduct further inquiry on the nature of defendant's complaints.

However, even if we were to decide the court erred in failing to conduct an adequate *Marsden* hearing on the first day of trial, we would conclude the error was harmless beyond a reasonable doubt. (*People v. Chavez* (1980) 26 Cal.3d 334, 348-349 [161 Cal.Rptr. 762, 605 P.2d 401]; *Marsden, supra*, 2 Cal.3d at ·p. 126.) The trial court held a *Marsden* hearing later in the trial, after asking defendant to put his concerns in writing. We assume defendant's

written catalogue of reasons was exhaustive. Testimony by defendant and Brooks during that hearing revealed a conflict over trial tactics unrelated to the issues raised by defendant on the first day. The court correctly denied the motion, stating: "I find that Mr. Brooks has properly represented Mr. Leonard, and I believe he will continue to do so. Nothing has caused me to believe otherwise. I do believe that there are personality conflicts, but I do not believe that there's been such a breakdown in the relationship that would make it impossible for Mr. Brooks to properly represent Mr. Leonard. [¶] He's raised some concerns. I find that most of those concerns are over trial tactics. In the [S]tate of California I do not believe in this case that trial tactics alone should be the basis for a *Marsden* motion, especially in light of the previous proceedings in which Mr. Brooks represented Mr. Leonard up until the day of trial, was relieved and substituted back in. . . . [¶] . . . [¶] . . . I find that the deterioration in the relationship is based at least partially on Mr. Leonard's recalcitrant attitude. . . ." Defendant does not appeal this ruling.

## C. Lack of Representation During Jury Selection:

■ Defendant also challenges the court's determination his acquiescence in self-representation was "voluntary" under *Faretta* and its progeny. Citing *People v. Hill, supra,* 148 Cal.App.3d 744, and *People v. Cruz* (1978) 83 Cal.App.3d 308 [147 Cal.Rptr. 740], he asserts the court's failure to conduct a *Marsden* hearing on the first day of trial tainted his decision to represent himself during jury selection. Neither party questions the applicability of *Faretta* to the issues raised by defendant in this appeal.

As this court recently explained, " 'In *Faretta*, the United States Supreme Court held that a defendant in a state criminal prosecution has a constitutional right under the Sixth and Fourteenth Amendments to waive counsel and represent himself. [Citation.] Once defendant asserts this right, the court must determine whether he has the mental capacity to make a *voluntary* and intelligent waiver of the right to counsel. [Citation.]' " (*People v. Robinson* (1997) 56 Cal.App.4th 363, 371 [65 Cal.Rptr.2d 406], quoting *People v. Nauton* (1994) 29 Cal.App.4th 976, 979 [34 Cal.Rptr.2d 861], italics added.) However, "when a defendant has elected to proceed to trial represented by counsel and the trial has commenced, it is thereafter within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed *pro se*." (*People v. Windham, supra,* 19 Cal.3d at p. 124.) Having reviewed the record, we conclude there was no abuse of discretion or due process violation in the case before us.

The court properly denied defendant's request for appointment of a new attorney on the first day of trial, exercised its discretion to deny as untimely

his request for continuance to obtain counsel, and gave defendant the choice of proceeding with Brooks or representing himself. It did not believe the request for continuance was "for any other reason except to delay the proceedings." The court treated the matter as a *Faretta* issue, and admonished defendant on self-representation. Defendant decided to proceed without counsel, but stated he was being forced to defend himself. Although the court denied defendant's motion for continuance, it gave defendant time to review the materials held by Brooks before taking evidence in the case. Defendant does not claim he had insufficient time to prepare.

The fact defendant faced a difficult choice of options occasioned by the court's denial of his untimely and unjustified request for appointment of substitute counsel does not mean defendant's decision to represent himself was involuntary or otherwise coerced. The record supports the conclusion defendant fired Brooks because he was angry about being chained, not because he was incompetent. (See *People v. Fierro, supra,* 1 Cal.4th at p. 204.) The same evidence supports the court's suspicion defendant sought substitution of counsel and continuance of trial for purposes of delay. In other words, the dilemma was of defendant's own making. We also question defendant's claim of actual prejudice in light of the court's express findings in response to Brooks's motion for mistrial following jury selection.

IV

*The Right to Remain Silent*

As we explained, section 6601 authorizes the Department of Mental Health to conduct a full mental health evaluation of any inmate the Department of Corrections determines is likely to be an SVP. (§ 6601, subds. (b) & (c).) At least two mental health professionals then evaluate the inmate in accordance with standardized assessment protocol.[3] (§ 6601, subds. (c) & (d).)

■ Defendant maintains that the court denied him the constitutional right to remain silent by: (1) allowing the psychologists who testified as expert witnesses to rely on material from interviews he gave under duress; and (2) allowing the district attorney to call him as a witness at trial. Because the SVPA involves a civil proceeding (*Hubbart, supra,* 19 Cal.4th at pp. 1170-1174, 1179), we resolve these questions against defendant under *Allen*

---

[3]The protocol requires "assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. Risk factors to be considered shall include criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder." (§ 6601, subd. (c).)

*v. Illinois* (1986) 478 U.S. 364 [106 S.Ct. 2988, 92 L.Ed.2d 296] (hereafter *Allen*).

### A. *Trial Proceedings:*

The district attorney placed defendant's statements before the jury in two ways. First, all four expert witnesses based their opinions in part upon interviews defendant had with Dr. Stubbins and Dr. Macomber before trial. Defendant declined to be interviewed by Dr. Finnberg and Dr. Trompetter. Second, the district attorney called defendant as a witness.

On the first day of trial, after Brooks was relieved as defense counsel, defendant objected to the expert witnesses' use of the interviews. He asserted "the doctors' reports [were] taken under duress, while [he] was in custody, forced, to take and go to the doctors by priority conduct through prison system, through California Department of Corrections. In other words, [he would be] imprisoned another year in prison if [he] failed to report for one of the interviews." The court denied defendant's motion.

On the second day of trial, after he was reappointed, Brooks moved to prevent the psychologists from considering the content of the interviews with defendant, arguing that "they were obtained using an unconstitutional form of duress regarding threats of additional incarceration should he not comply with their procedure."[4] The court again denied the motion. It ruled that "the method by which the information was received may go to the weight of the information received. It may bear on its reliability. But in order for this statute to have any effect whatsoever, it indicates that an incarcerated defendant has to be evaluated. I'm going to assume that a portion of that evaluation, to make it a fair and proper evaluation, is going to depend upon the defendant talking to the experts. If he chose not to talk to the expert, that would go to the weight of their ultimate opinion, and they have to rely on things from the past. I'm not satisfied that that statute, as it exists now, creates such a coercive situation for any defendant that they would feel compelled not to answer truthfully, and that is the thrust, I think, of what we're talking about now. The reliability of that information. [¶] . . . But with regard to excluding it based on the mere fact that he may have been told you got to do this would seem to defeat one of the major purposes of this statute; that is, to get good information, to be good, current information, to be able to make a determination whether in fact a person is a sexually violent predator."

Defense counsel also objected to the district attorney's calling defendant to testify. The court ruled the district attorney was entitled to call defendant

---

[4]Neither defendant nor Brooks made an offer of proof or otherwise detailed defendant's claims of duress in support of their motion to exclude the testimony.

as a witness because the Legislature "designated this a civil-type case based on the treatment aspects." The court considered the objection a standing objection.

In response to the district attorney's questions, defendant testified he had never intentionally sexually assaulted a woman. At the same time, he acknowledged he was sentenced to prison following the two rape convictions alleged in the petition. The district attorney elicited testimony about defendant's other sexual offenses involving violence. Defendant stated an alleged 1980 offense "never happened" because he was not prosecuted for it. He claimed in connection with a 1977 Sacramento case that the allegation of attempted rape was "in [the victim's] mind." In response to the district attorney's description of an incident in which the victim accused him of "throwing her around in the room, throwing her around the bed, choking her and striking her face," defendant maintained that his "leg gave out and [he] fell into her, simple as that."

Defendant also testified about his relationship with the victim in the 1987 rape conviction cited in the petition. He explained that he and the alleged victim were good friends who were on a date the night of the incident. Defendant acknowledged telling Dr. Macomber that the alleged victim was a "loose girl" who was "prostituting herself for drugs." He maintained at the time of trial that she accused him of rape to escape a beating by her mother.

B. *Expert Witnesses' Use of Defendant's Interviews:*

Defendant analogizes the section 6600 proceedings with proceedings under Penal Code section 1369 to determine a criminal defendant's mental competency to stand trial. In that context, " 'neither the statements of [an accused] to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of . . . guilt, under either the plea of not guilty or that of not guilty by reason of insanity.' " (*People v. Arcega* (1982) 32 Cal.3d 504, 520 [186 Cal.Rptr. 94, 651 P.2d 338], quoting *Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465, 470 [122 Cal.Rptr. 61]; see also *Estelle v. Smith* (1981) 451 U.S. 454 [101 S.Ct. 1866, 68 L.Ed.2d 359].)

Defendant need not resort to criminal analogies when *Allen* is directly on point. In that case, the United States Supreme Court rejected the claim that proceedings under the Illinois Sexually Dangerous Persons Act were criminal within the meaning of the Fifth 'Amendment's guarantee against compulsory self-incrimination. (*Allen, supra,* 478 U.S. at pp. 365, 368 [106 S.Ct. at

pp. 2991-2992, 92 L.Ed.2d at pp. 302-304].) Like the SVPA, the Illinois statute required the inmate Allen to submit to two psychiatric examinations. At a bench trial to determine whether Allen was a sexually dangerous person, the state presented the testimony of the two examining psychiatrists, over defense counsel's objection they had elicited information from his client in violation of the privilege against self-incrimination. (*Id.* at pp. 365-366 [106 S.Ct. at pp. 2990-2991, 92 L.Ed.2d at pp. 302-303].) The trial court found Allen to be a sexually dangerous person under the Illinois act. (*Id.* at p. 366 [106 S.Ct. at pp. 2990-2991, 92 L.Ed.2d at p. 303].)

Using the same analysis as *Kansas v. Hendricks* (1977) 521 U.S. 346 [117 S.Ct. 2072, 138 L.Ed.2d 501], the Supreme Court ruled proceedings under the Illinois Sexually Dangerous Persons Act were not criminal for purposes of the Fifth Amendment guarantee against compulsory self-incrimination. (*Allen, supra,* 478 U.S. at p. 374 [106 S.Ct. at pp. 2994-2995, 92 L.Ed.2d at pp. 307-308].) It also declined to apply the privilege in the noncriminal commitment proceeding under the due process clause. (*Id.* at p. 374 [106 S.Ct. at pp. 2994-2995, 92 L.Ed.2d at p. 308].) *Allen*'s rationale applies with equal force to the case before us: "[I]t is difficult, if not impossible, to see how requiring the privilege against self-incrimination in these proceedings would in any way advance reliability. Indeed, the State takes the quite plausible view that denying the evaluating psychiatrist the opportunity to question persons alleged to be sexually dangerous would *decrease* the reliability of a finding of sexual dangerousness. . . . '[T]o adopt the criminal law standard gives no assurance' that States will reach a 'better' result. [Citation.] [¶] The privilege against self-incrimination enjoined by the Fifth Amendment is not designed to enhance the reliability of the factfinding determination; it stands in the Constitution for entirely independent reasons. *Rogers* v. *Richmond*, 365 U. S. 534, 540-541 [81 S.Ct. 735, 5 L.Ed.2d 760] (1961) (involuntary confessions excluded 'not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system')." (*Allen, supra,* at pp. 374-375 [106 S.Ct. at p. 2995, 92 L.Ed.2d at p. 308].)

### C. *The District Attorney's Examination of Defendant:*

*Allen* also defeats defendant's claim the district attorney was not entitled to call him as a witness in the SVPA proceedings. However, we cannot leave the issue of defendant's trial testimony without commenting on the complaint his "credibility was diminished" by "testimony [that] must have seemed incongruous or implausible to the jurors."

The SVPA provides for the collection of reliable evidence to assist the jury in determining whether the person before the court is an SVP. (§§ 6601,

6603.) As stated in *Allen* (478 U.S. at pp. 374-375 [106 S.Ct. at pp. 2994, 2995, 92 L.Ed.2d at p. 308]), and echoed by the trial judge in this case, the inmate's participation enhances the reliability of the outcome. That defendant's credibility might have been questioned by the jury is not the fault of the procedure established by the SVPA, or the fact the Supreme Court held that a nearly identical Illinois law did not establish a criminal proceeding. Credibility was a matter largely within defendant's control.

V-X*

· · · · · · · · · · · · · · · · · · · · · · · · · ·

XI

*Refusal to Instruct on Effect of Prior Indeterminate Sentence*

As originally drafted, the first paragraph of section 6600, subdivision (a) defined "sexually violent predator" as an inmate who had been convicted of a sexually violent offense against two or more victims for which he received a *determinate* sentence. (Stats. 1995, ch. 763, § 3.) A 1996 amendment to subdivision (a) added the following as paragraph two: "For purposes of this subdivision, a prior finding of not guilty by reason of insanity for an offense described in subdivision (b), *a conviction prior to July 1, 1977, for an offense described in subdivision (b)*, a conviction resulting in a finding that the person was a mentally disordered sex offender, or a conviction in another state for an offense that includes all the elements of an offense described in subdivision (b), shall also be deemed to be a sexually violent offense *even if the offender did not receive a determinate sentence for that prior offense*." (Stats. 1996, ch. 462, § 4, italics added.)

Outside the presence of the jury, the court ruled it would not instruct the jury in accordance with the option provided in CALJIC No. 4.19 (1997 new) which read: "The term 'sexually violent predator' means a person who, (1) has been convicted of a sexually violent offense against two or more victims for which he or she received a [*determinate*] sentence, . . ." (Italics added.) The court explained its ruling: "In Section 6600, the section states that for purposes of this subdivision a conviction prior to July 1st, 1997, shall also be deemed a sexually violent offense even if the offender did not receive a determinate sentence for the prior offense. The information presented in this case, with regard to Mr. Leonard's conviction in Sacramento County on Exhibit 1, indicates that he was convicted actually on July 6th, 1977, of a qualifying crime. The offense occurred prior to July 1st of 1977, which

---

*See footnote, *ante*, page 776.

would have brought it under the auspices of indeterminate sentencing law. Therefore, he was sentenced under the indeterminate sentencing law.

"Section 6600 appears to me to try to cover all events equally, but talks only about a conviction prior to July 1977 with an indeterminate sentencing. In this case, again, the crime occurred before July 1st, 1977, so therefore it[] had to be sentenced under indeterminate sentencing, though the sentence occurred after July 1st, 1977.

"I have reviewed also the new patterned instruction under 4.19, which does not specifically address that language but does have a section [in a] paragraph, full Paragraph 3, with the bracketed term determinate sentencing.

"In this case it's clear that as a matter of law that Mr. Leonard's crimes do fit under this section. It also appears to this Court that it was the intention of the [L]egislature that convictions for qualifying offenses even before July 1st, 1977, may be qualifying offenses under Section 6600. Therefore, I would propose to read the instruction in Paragraph 3 and simply delete determinate sentencing, because I don't believe it would be particularly relevant to this jury. I believe that's a matter of law to be determined by the Court." Defense counsel Brooks objected, requesting that the statute be strictly construed.

On appeal, defendant again argues the language of section 6600, subdivision (a) is unambiguous and should be construed in accordance with its plain meaning. Defendant insists the court's erroneous jury instruction removed from the jury's consideration the allegation he was a sexually violent predator, and, in effect, directed a verdict against him. Because the jury was prevented from considering whether the SVPA's requirement concerning determinate sentencing for prior offenses was fulfilled, he maintains the error is reversible per se. We independently review the court's ruling on the legal question of statutory construction. (*Poliak v. Board of Psychology* (1997) 55 Cal.App.4th 342, 348 [63 Cal.Rptr.2d 866] (hereafter *Poliak*).)

■ In *Poliak*, we outlined the settled rules governing statutory construction: " '. . . We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] "In determining intent, we look first to the language of the statute, giving effect to its 'plain meaning.' " [Citations.] Although we may properly rely on extrinsic aids, we should first turn to the words of the statute to determine the intent of the Legislature. [Citation.] Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.'

[Citation.] [¶] 'If the statutory language is clear and unambiguous, there is no need for construction.' [Citation.]" (*Poliak, supra,* 55 Cal.App.4th at p. 348.) Moreover, a particular provision must be construed with reference to the entire statutory scheme of which it forms a part in such a way that harmony may be achieved among the parts. (*People ex rel. Younger v. Superior Court* (1976) 16 Cal.3d 30, 40 [127 Cal.Rptr. 122, 544 P.2d 1322].)

 The California Supreme Court recently adopted a construction which harmonized seemingly inconsistent paragraphs of the three strikes law, "[r]ather than rewrit[ing] the statute in any way." (*People v. Garcia* (1999) 21 Cal.4th 1, 6 [87 Cal.Rptr.2d 114, 980 P.2d 829].) Specifically, the court rejected the Attorney General's proposal to rewrite Penal Code section 667, subdivision (d)(3)(D) to cross-reference statutory lists of serious and violent felonies because it ignored "necessary limitations on [its] proper role in statutory interpretation." (*Garcia, supra,* at p. 14.) Given the divergent views on how the statute would best be corrected, the Supreme Court left "for the People and the Legislature the task of revising it as they deem wise." (*Id.* at p. 15.) The Supreme Court cautioned that "[c]onsistant with the separation of powers doctrine (Cal. Const., art. III, § 3), [it had] previously limited [itself] to relatively minor rewriting of statutes and, even then, only resorted to that drastic tool of construction when it [was] obvious that a word or number had been erroneously used or omitted. [Citations.]" (*Id.* at pp. 14-15.)

Here, there is an obvious grammatical mistake in the placement of the date in section 6600, subdivision (a). It is no coincidence the Legislature selected July 1, 1977, as the cutoff date in its 1996 amendment to section 6600. The Legislature repealed the indeterminate sentencing law (ISL) on July 1, 1977, when the determinate sentencing law took effect. (Stats. 1977, ch. 165, § 15, p. 647, operative July 1, 1977.) Penal Code sections 1170, subdivision (a)(3) and 1168, subdivision (b) required that persons convicted of crimes which occurred before that date be sentenced under the ISL. In this context, the Legislature could not have intended to exclude from operation of the SVPA persons who committed qualifying crimes before July 1, 1977, but were convicted of those crimes and sentenced under the ISL after July 1, 1977. Correcting the sentence to show what the Legislature must have intended, it reads: "For purposes of this subdivision, . . . a conviction for an offense described in subdivision (b) [*committed prior to July 1, 1977,*] . . . shall also be deemed to be a sexually violent offense even if the offender did not receive a determinate sentence for that prior offense."

We conclude our "relatively minor rewriting" of section 6600, subdivision (a) is authorized by *Garcia* to correct the obvious grammatical error. The

court properly found Leonard's crimes fit within the statute as we have construed it. Accordingly, the court did not err in modifying CALJIC No. 4.19 to omit the reference to a determinate sentence.

## XII*

### *Cumulative Error*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The order is affirmed.

Blease, Acting P. J., and Morrison, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 21, 2000. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 776.