Filed 3/6/13  P. v. Kindseth CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054294 |
| v. | (Super.Ct.No. FMB1100011) |
| MICHAEL ALLEN KINDSETH, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Rodney A. Cortez, Judge.  Affirmed.

Charles R. Khoury, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Melissa Mandel, Marissa Bejarano, and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Michael Allen Kindseth led a San Bernardino County Sheriff's deputy on a high speed chase on his motorcycle that ended in the desert. Defendant abandoned his motorcycle and was found hiding in the bushes. In his backpack, over 19 grams of methamphetamine were found, along with several other items indicative of drug sales and a firearm. Defendant was convicted of evading a police officer, possession of a controlled substance for sale, transportation of a controlled substance, and possession of a firearm by a felon.

Defendant now contends on appeal as follows:

1.    His Sixth and Fourteenth Amendment rights to effective assistance of counsel were violated when the trial court denied his motion to substitute trial counsel prior to trial brought pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

2.    The trial judge should have recused himself once it was discovered he had prosecuted defendant when he was a deputy district attorney in previous cases and that failure to recuse himself violated defendant's right to a fair trial and due process under the Fourteenth Amendment of the federal Constitution.[1]

I

PROCEDURAL BACKGROUND

Defendant was convicted by a jury of evading a police officer (Veh. Code, § 2800.2, subd. (a)) (count 1); possession of a controlled substance for sale (Health &

---

[1]    Defendant filed a petition for writ of habeas corpus in case No. E056557 (the petition). We ordered that the petition be considered with the instant appeal. We will decide the petition by separate order.

2

Saf. Code, § 11378) (count 2); transportation of a controlled substance (Health & Saf. Code, § 11379, subd. (a)) (count 3); and of possession of a firearm by a felon (Pen. Code, former § 12021, subd. (a)(1); see now Pen. Code, § 29800, subd. (a)(1)) (count 4).[2] As to counts 2 and 3, the jury found true the special allegation that he was personally armed with a firearm during the commission of the crimes (Pen. Code, § 12022, subd. (c)). In a bifurcated proceeding, defendant, after waiving his right to jury trial, admitted that he had served four prior prison terms within the meaning of Penal Code section 667.5, subdivision (b). He also admitted the allegations pursuant to Health and Safety Code section 11370.2, subdivision (c), as to counts 2 and 3, that he had a prior drug conviction.

On count 3, defendant was sentenced to four years, plus three years for the prior drug conviction allegation, plus five years for being personally armed with a firearm, for a total of 12 years. On counts 1 and 4, he received a sentence of eight months each, which were ordered to run consecutive to count 3 and each other. He was sentenced to four additional years for the four prior prison term enhancements. Defendant received a total sentence of 17 years 4 months.

II

FACTUAL BACKGROUND

On January 7, 2011, San Bernardino County Sheriff's Deputy Michael Sellers was on patrol in a marked patrol car in the town of Yucca Valley in San Bernardino County.

---

[2] Prior to trial, defendant admitted that he had a prior felony conviction for purposes of the felon in possession of a firearm charge.

3

At 8:36 p.m., he observed defendant, who was on a motorcycle driving eastbound on State Route 62, run a red light. Deputy Sellers activated his emergency lights and siren and drove behind defendant. Defendant was wearing dark clothing and had a backpack on his back.

After Deputy Sellers activated his lights and siren, defendant accelerated to approximately 90 miles per hour; the speed limit was 40. Defendant made no attempt to pull over. Defendant engaged in reckless driving and posed a risk to public safety.

Defendant eventually drove onto a dirt road (near the roads of Sunnyslope and Sage) and was able to go through a small opening in a fence into the open desert. Deputy Sellers could not follow him in his car.

Deputy Sellers exited his car and pursued defendant on foot. Not far from the fence, Deputy Sellers found the motorcycle discarded in a bush. Deputy Sellers found one left glove and one right shoe. The keys were still in the motorcycle.

Defendant was found hiding nearby in some brush. Defendant was not wearing any shoes. Within about two feet of defendant, Deputy Sellers found a backpack, another bag, and some clothing. Also nearby were one shoe and one glove that matched the ones found near the motorcycle. The backpack was the same one that defendant had been wearing when Deputy Sellers was following behind him.

Inside the backpack, in a plastic Tupperware-type container, Deputy Sellers found an off-white powered substance resembling methamphetamine. He also found three baggies filled with the same substance. He weighed these substances and they totaled 19

4

grams. In addition, an unloaded .357 magnum revolver was found in the backpack. A bank envelope was found containing $7,000 cash and another wallet contained $7,300 cash.

There was also a DVD case containing several pornographic DVD's. The initials "MAK" were on the movies. Several empty baggies that were commonly used to package methamphetamine for sale were inside the backpack.

Inside the other bag found near defendant, Deputy Sellers found a police scanner. In addition, a black case contained a spoon with a white residue and a needle filled with a clear substance. An eyeglass case was also found that contained syringes. A total of 21 syringes were found. A wallet in the bag contained credit cards bearing defendant's name. There was a notebook containing what appeared to be notations of drug sales. A digital scale containing a white substance was also found. A preliminary test on the substances in the baggies and plastic container tested positive for methamphetamine.

Defendant told another sheriff's deputy that he had purchased the revolver found in his backpack "days before" for "a couple hundred dollars." He acknowledged possession of the gun.

A criminalist tested the three baggies and the substance from the plastic container found in defendant's backpack. The total gross weight was 19.93 grams. All of the substances tested positive for methamphetamine.

Several phone calls between defendant and an unidentified female while he was detained in jail were played for the jury. In one conversation, defendant told the female,

"[W]hat's really gonna fuckin' fuck me up is, is the possession of a firearm with the fuckin' dope."  In another conversation, the female asked defendant where it was that he crashed and crawled in the desert, "so [she] could go kinda like look?"  He described the area as being off of Sage and Sunnyslope roads.  Defendant told the female to look for his "Tupperware."  He described the location of the container that held "thirty-six" between where his bike was stuck and a tree.  In a final conversation, defendant and the female discussed someone that they both knew, and defendant stated that that person knew he was a drug dealer.  They discussed someone who stole "nine grams" from defendant. Defendant also said, "Jarrod's been gettin' his dope from me for the last fuckin' year?"

San Bernardino County Sheriff's Sergeant James Porter was assigned to the Morongo Basin Station in Joshua Tree.  In his years of patrol and supervision in the Morongo Basin area, he had seen persons who both use and sell drugs.  Looking at what was found in defendant's backpack and in the other bag, it was Sergeant Porter's determination that the methamphetamine was possessed for purposes of sale.  He based his opinion on the amount of methamphetamine possessed, packaging materials, possession of the digital scale, the notebook that appeared to notate drug sales, the large amount of cash, the police scanner, and the firearm.  Deputy Sellers also surmised that defendant possessed the methamphetamine for purposes of sales based on the same criteria.

6

The parties stipulated that defendant had a prior conviction of violating Health and Safety Code section 11378, possession for sale of a controlled substance. Defendant presented no evidence.

III

*MARSDEN* MOTION

Defendant contends that the trial court erred by denying his *Marsden* motion to substitute his trial counsel brought prior to trial.

A.     *Additional Factual Background*

On July 8, 2011, the trial court heard defendant's *Marsden* motion brought against his counsel. Defendant asked to be given time to hire his own lawyer. Defendant claimed that counsel had never been to see him at the jail and had not explained the charges against him. Defendant claimed that there was some type of "deal" that was not explained to him. Also, trial counsel kept telling defendant that he was investigating something, but defendant was not sure what it was. Defendant was upset that the matter kept being continued. Also, he claimed that he wanted a deal rather than go to trial, but it had not worked out because counsel did not come to see him. Defendant claimed that he had tried to call counsel's office for three weeks, but they had not accepted his calls.

Counsel explained at the behest of the trial court that he had been in criminal practice for more than 35 years. He had been a prosecutor, a judge, and a defense attorney. Counsel had been assigned to defendant's case since January 2011.

7

Counsel explained that he had interviewed all of the witnesses against defendant. He had discovery in the case, including police reports. Also, there were 50 tape recordings of jailhouse conversations between defendant and other people. Counsel admitted he had never visited defendant in jail. His investigator had visited defendant. Counsel said it was his custom and practice to not visit his clients in jail.

Defendant claimed that he had not seen an investigator. Counsel expressed that he had relayed a 12-year plea offer from the People to defendant in court, and defendant had told him that it was too much time. Counsel assured the trial court he had told defendant the offers made in the case. Counsel indicated that defendant had not been anxious to go to trial quickly, and any continuances were in order to thoroughly investigate the case. The investigator had spoken with all of the witnesses. Counsel suggested that defendant be given a week to hire his own private lawyer if that is what he wanted to do.

The trial court ruled as follows: "To the extent that there are any conflicts from the statements, they are never going to be one hundred percent consistent from one perspective versus another. And I don't see any serious conflicts in the statements that have been made here. [¶] I see different perceptions on what has been done to this point. And I believe that [counsel] is properly able to represent the defendant. And it appears from his representation to the court today that he has made the correct steps to prepare for trial. He has taken the appropriate measures in having his investigator make contact with witnesses and get further witness statements and prepare the case for trial, and that he is properly prepared, able, and qualified to represent the defendant. [¶] And that

8

thecertainly is some communication issues that can be addressed between [counsel] and Mr. Kindseth, but that happens in all cases, is you don't always see things eye to eye with your attorney, even if it is an attorney that you end up paying for. [¶] But at this point, based on what has been presented to the court, the court is not going to relieve [counsel]. I feel it is appropriate for him to stay on the case, and the motion is denied."

Defendant asked about drug court, but the trial court advised him he was not eligible.

B.    *Marsden* Motion

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To that end, a defendant can make a motion to substitute counsel on the grounds that counsel's representation is inadequate or because of dissatisfaction with counsel. (See *Marsden, supra,* 2 Cal.3d at pp. 123-124.)

"[T]he trial court must give the defendant the opportunity to explain the reasons for desiring a new attorney." (*People v. Smith* (1993) 6 Cal.4th 684, 690.) "When a defendant moves for substitution of appointed counsel, the court must consider any specific examples of counsel's inadequate representation that the defendant wishes to enumerate." (*People v. Webster* (1991) 54 Cal.3d 411, 435.)

"[T]he decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court,

9

and a defendant has no absolute right to more than one appointed attorney." (*Marsden, supra*, 2 Cal.3d at p. 123; see also *People v. Leonard* (2000) 78 Cal.App.4th 776, 786.) "The court does not abuse its discretion in denying a *Marsden* motion '"unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel."' [Citations.] Substantial impairment of the right to counsel can occur when the appointed counsel is providing [constitutionally] inadequate representation or when 'the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation].'" (*People v. Clark* (2011) 52 Cal.4th 856, 912.)

Defendant failed to state adequate reasons to obtain substitution of counsel. The trial court gave defendant ample opportunity to express his concerns about counsel. Defendant complained that counsel had not visited him in jail, an accusation that counsel admitted. However, counsel stated that his investigator had visited defendant and that it was his common practice to have an investigator visit his client in jail. Although defendant complains that this custom and practice should not excuse counsel's behavior, it does not show constitutionally inadequate representation. "'[T]he number of times [a defendant] sees his attorney, and the way in which one relates with his attorney, does not sufficiently establish incompetence.' [Citation.]" (*People v. Hart* (1999) 20 Cal.4th 546, 604.)

Counsel had interviewed all of the witnesses in the case. He also had the discovery, including police reports. Counsel had spoken with defendant in court,

10

including engaging in a lengthy discussion with him regarding the plea deal of 12 years offered by the People. There was no indication that counsel was unprepared to proceed to trial or had been ineffective in his preparation.

The trial court recognized there was a disparity in the statements given by defendant and counsel but considered that counsel appeared to be preparing appropriately for the case. It also considered that although there were apparent communication problems, defendant and counsel were not so embroiled in conflict that they had no discussions about the case or could not work together.

Defendant complains that counsel was ineffective for failing to communicate to him a plea deal of 12 years offered by the People. This accusation is belied by the record. Counsel explicitly stated on the record that he had communicated the 12-year deal to defendant, that they had discussed it at length, and that defendant had rejected the deal as being too much time. This was not grounds to substitute counsel.

The record is clear that the trial court considered defendant's concerns and reasonably found them to be insufficient to warrant relieving trial counsel. The trial court did not abuse its discretion in declining to substitute counsel.

IV

JUDICIAL BIAS

Defendant contends the trial judge, Judge Rodney A. Cortez, was biased against him because he had prosecuted defendant in a prior case when he was employed as a deputy district attorney in San Bernardino County. Although defendant failed to file a

11

motion to disqualify Judge Cortez under Code of Civil Procedure section 170.1, subdivision (a)(6)(A)(iii) or seek review by way of a writ under section 170.3, subdivision (d), he claims on appeal that his rights to due process under the federal and state Constitutions entitling him to a trial by an impartial trial judge were violated.

A. *Additional Factual Background*

After Deputy Sellers had completed a majority of his direct examination, defense counsel brought to the attention of Judge Cortez that he had been the prosecuting attorney while with the San Bernardino County District Attorney's office in three prior cases involving defendant. In one case, which counsel initially alleged was from 2006, defendant had pleaded guilty to evading a police officer and received a prison sentence. The case number was FMB004143. Another case (case No. TMB19769) was dismissed due to a plea agreement. Finally, there was a third case involving a violation of probation for driving under the influence, which was case No. TMB19574.

Judge Cortez advised counsel that he was a deputy district attorney in San Bernardino County in 1999. Counsel then noted the felony conviction for evading a police officer was from 2000. Judge Cortez noted for the record that he first became aware of being involved in the cases just 10 minutes before during a conference in chambers.

Judge Cortez then stated for the record as follows: "[Defendant] is not someone that I recognize, other than being in court here on this trial. I have no recollection of [defendant] or any of those cases that were just mentioned. The Court is not concerned

12

with it's [*sic*] ability to provide [defendant] with a fair trial not to this point or having had this information brought to me. I will continue to provide him with a fair trial because again, I don't know the circumstances of those prior offenses. Again, I don't recall [defendant] personally and professionally from being a prosecutor in the last case, which was brought to my attention, in September 2000, that would have been nearly 11 years ago. [¶] The Court will obviously make that part of the record and that [defendant] has concerns, in regards to the Court provided -- well, I don't know what those concerns are."

Counsel stated it was a conflict of interest. Judge Cortez reiterated that he felt he could continue to provide defendant with a fair trial. Further, it appeared that the cases were pleas and did not go to trial. Judge Cortez stated, "Again, my decisions that I make in this trial throughout the entire proceedings, will be free of any bias or prejudice and that information will not bias me or prejudice me in any fashion."

Defendant admitted several prior convictions pursuant to section 667.5, subdivision (b), which included case No. FMB004143. Defendant never asked Judge Cortez to recuse himself and did not file a motion to disqualify him.

B. *Analysis*

"A criminal defendant has due process rights under both the state and federal Constitutions to be tried by an impartial judge. [Citations.] Indeed, '[i]t is axiomatic that "[a] fair trial in a fair tribunal is a basic requirement of due process."' [Citation.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 455.)

13

In *People v. Brown* (1993) 6 Cal.4th 322 (*Brown*), the defendant brought a motion

to disqualify the judge pursuant to former Code of Civil Procedure section 170.1,

subdivision (a)(6)(c), which was denied.[3] The defendant then filed a writ petition to

review the determination that was denied summarily. (*Brown*, at pp. 326-327, 336.)[4] On

appeal, the defendant argued that he was denied due process under both the federal and

state Constitutions because he was "'sentenced to death by a judge who was not

impartial.'" (*Id*. at p. 332.) The California Supreme Court concluded that the only

grounds for relief for the denial of a disqualification motion is by a writ petition. (*Id*. at

p. 335.) It noted that the purpose behind Code of Civil Procedure section 170.3,

subdivision (d) is to secure """"speedy review of a disqualification ruling, since permitting

that ruling to be attacked later on appeal of the judgment could invalidate every ruling

made by the trial court judge after the disqualification motion was denied."""" (*Brown*, at

p. 333, fn. 8.) Nonetheless, on appeal, defendant could still raise the nonstatutory claim

that the judge who presided over his hearing was not impartial. (*Id.* at p. 336.) The

---

[3]     Defendant claims that Judge Cortez could have been disqualified under
current Code of Civil Procedure section 170.1, subdivision (a)(6)(A)(iii), which provides
that a judge is disqualified if, for any reason, "[a] person aware of the facts might
reasonably entertain a doubt that the judge would be able to be impartial."

[4]     A writ petition can be filed under Code of Civil Procedure section 170.3,
subdivision (d), which provides in pertinent part, "The determination of the question of
the disqualification of a judge is not an appealable order and may be reviewed only by a
writ of mandate from the appropriate court of appeal sought only by the parties to the
proceeding. The petition for the writ shall be filed and served within 10 days after
service of written notice of entry of the court's order determining the question of
disqualification."

14

California Supreme Court has since broadened the right to appeal finding that "a defendant who raised the claim at trial may always 'assert on appeal a claim of denial of the due process right to an impartial judge.' [Citation.]" (*People v. Chatman* (2006) 38 Cal.4th 344, 363.)

In *People v. Freeman* (2010) 47 Cal.4th 993, the California Supreme Court clarified review of a disqualification claim on due process grounds. It stated, "[i]n this case, defendant had a statutory remedy to challenge [the trial judge's] refusal to disqualify himself and failed to pursue it. Having forfeited that remedy, she cannot simply fall back on the narrower due process protection without making the heightened showing of a probability rather than the mere appearance, of actual bias to prevail." (*Id.* at p. 1006.) Therefore, "'[b]ased on an objective assessment of the circumstances in the particular case, there must exist "'the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable.'" [Citation.]'" (*People v. Cowan, supra,* 50 Cal.4th at p. 456.)

Here, we find no actual bias on behalf of Judge Cortez. We have reviewed the entire trial record and find nothing in the record to support actual bias. Hence, defendant has not shown a due process violation under either the state or federal Constitution.

Defendant claims Judge Cortez's bias was shown by his ruling that the DVD's found in his backpack were admissible as exhibits and that the movie titles, which were pornographic in nature, need not be blacked out or removed before going into the jury room.

15

While discussing the exhibits, defense counsel objected to the admission of the DVD movies that were found in defendant's backpack. The titles of the movies, which were pornographic films, were highly prejudicial. Defense counsel wanted to black out the names and also instruct the jury not to watch the movies. Judge Cortez felt that the movies, which also had defendant's initials, were relevant and should be admitted to show ownership of the backpack. Defense counsel again asked that the titles be blacked out even if the movies with the initials were allowed in as exhibits that the jury could view.

Judge Cortez stated that he would not black out the names as there were no allegations that the movies were illegal. Judge Cortez, however, would not read the titles into the record. The jurors reached their verdicts prior to any exhibits being taken to the jury deliberation room, i.e., they never saw the titles.

We do not consider this ruling to be biased against defendant. Judge Cortez stated his reasons for admitting the titles on the record. Whether this was a correct ruling is not before this court and it certainly does not show actual bias. Although defendant refers to the "appearance" of bias, it is clear from the aforementioned authorities that he must show actual bias. (*People v. Cowan, supra,* 50 Cal.4th at pp. 456-457.) No such showing was made here.

Defendant also refers to Judge Cortez making a comment to defense counsel that he should not get "smart" with him. After the ruling on the titles, wherein Judge Cortez stated that he was not going to read the titles on the record, defense counsel then stated,

16

"Well, if you're not going to say the names, they shouldn't be presented to the jury." Judge Cortez responded, "I understand your position. I've made my ruling." Defense counsel stated, "I heard that." Judge Cortez then stated, "Counsel, we are not going to get smart with the court."

Later, the following exchange occurred:

"[DEFENSE COUNSEL]: As far as the Court's instruction that I should not get smart with the Court. You've known me long enough and I've practiced long enough in front of you to know I don't do that. Correct?

[JUDGE CORTEZ]: Are you directing me to answer you?

[DEFENSE COUNSEL]: No. I'm asking. I'm not directing you to do anything.

[JUDGE CORTEZ]: I thought it was out of character for you, but that's the way it came across for the court.

[DEFENSE COUNSEL]: My comment was 'I heard that.' 'I heard your ruling.'

[JUDGE CORTEZ]: All right. So you're saying you were not being smart?

[DEFENSE COUNSEL]: Of course not.

[JUDGE CORTEZ]: Then I accept that. All right."

Nothing in the above exchange showed Judge Cortez's actual bias. Judge Cortez was concerned that defense counsel was disparaging the court and could certainly admonish counsel if he was engaged in such activity.

Defendant's showing of actual bias in this case is inadequate. Despite the fact that Judge Cortez was the prosecutor in previous cases involving defendant, they had

occurred numerous years in the past and Judge Cortez had no recollection of defendant.

No actual bias appears in the record.  Defendant's due process claim is rejected.

V

DISPOSITION

We affirm the judgment in its entirety.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.

18