Filed 1/17/14  P. v. Griffith CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ADRIAN WAYNE GRIFFITH,<br><br>Defendant and Appellant. | F065002<br><br>(Super. Ct. No. 10CM3835)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Donna Tarter, Judge.

J. Peter Axelrod, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted appellant Adrian Wayne Griffith of committing lewd and lascivious acts on a child under the age of 14 years and misdemeanor annoying or molesting a child. He raises several challenges to his convictions, including (1) the trial court abused its discretion in excluding impeaching evidence and in admitting other evidence, (2) instructional error, (3) failure to inquire into possible juror misconduct, (4) error in conducting a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) when he sought to discharge retained counsel, and (5) abuse of discretion in denying his motion for new trial.

We conclude the trial court erred in several respects and reluctantly reverse the convictions.

## FACTUAL AND PROCEDURAL SUMMARY

In November 2010, nine-year-old H.M. was living with her mother, Heather,[1] and her six-year-old brother, Joaquin. The family lived in a two-bedroom apartment, with H.M. and Joaquin sharing a bedroom and their mother using the other bedroom. Their apartment was in the same complex as the apartment Griffith shared with his wife, Frances, and their three children. H.M. and Joaquin were friends with Griffith's children and frequently played together.

Griffith, Frances, and Heather met and became friends because their children played together. They had dinner at each other's houses and socialized. Heather and Griffith talked and drank beers in the common areas of the apartment complex. Griffith sometimes came over to Heather's apartment to visit.

On the afternoon of Friday, November 5, 2010, Heather picked up H.M. and Joaquin from daycare after school and drove them home. H.M. and Joaquin went outside to play with Griffith's children. Heather joined Griffith and his nephew; the men were

---

[1]We refer to Heather and her son, Joaquin, by first names only in order to better protect the privacy of H.M.

2.

outside drinking beer. Heather consumed three or four beers. At one point, Frances came outside and argued with Griffith.

Heather went into her apartment to call Jesse, variously described as Heather's friend or boyfriend, to ask him if he wanted to come over to the complex. Jesse had met Griffith a week or two earlier. After calling Jesse, Heather went back outside and resumed talking and drinking with Griffith. Jesse arrived with more beer and joined Heather and Griffith. After about an hour, Heather, Jesse and Griffith, along with Heather's children, went up to Heather's apartment so she could feed the children dinner.

After feeding H.M. and Joaquin, Heather, Jesse, and Griffith went out onto the patio while the children watched television. Heather had already consumed six to seven beers that evening. The three adults continued to consume beer until they ran out and Jesse offered to go to the store for more beer. After Jesse left, Griffith grabbed Heather's hand and kissed her on the mouth. After touching and kissing on the porch, Griffith asked Heather to go into her bedroom with him.

Heather opined that she and Griffith were both intoxicated at this point. They went into Heather's bedroom, shut the door, undressed, and began having sexual intercourse on the floor. This was the first sexual encounter between them. A few minutes later, Jesse returned and interrupted them when he opened the bedroom door. Jesse said, "Oh, okay," and closed the bedroom door. Heather was embarrassed; she and Griffith began putting on their clothes.

After watching Jesse leave, H.M. tried to open the door to Heather's bedroom. She opened the door a little but it was dark inside and Heather yelled at her, "Go away." H.M. tried to open the door farther, but it was pushed closed, so she returned to the living room to watch television. Heather and Griffith came out into the living room. H.M. was "giggly" and "curious to what was all going on."

Heather told Joaquin and H.M. it was time for them to go to bed and to go lie down in her bedroom. Although H.M. and Joaquin had their own beds and bedroom,

3.

they sometimes slept in their mother's bed. H.M. and Joaquin went into their mother's room and climbed underneath the covers.

Heather called her friend Elise to talk about what had happened with Griffith; they spoke and made plans to meet and talk. Heather asked Griffith to watch the children while she went to talk with Elise and pick up more cigarettes. Griffith agreed to stay at the apartment while Heather was gone. Heather told H.M. she was going to pick up her friend, Elise, and Griffith would babysit them; she told both children to go to sleep.

According to H.M., after Heather left, Griffith asked H.M. to come into the living room, and she complied. Griffith spoke to her and then told her to go back to bed. H.M. went back to bed, but then Griffith called her again and she returned to the living room. Joaquin remembered Griffith calling H.M. because he felt he was missing something and was sad because Griffith did not call him.

At some point, Griffith told H.M. to go into her own bedroom and told Joaquin to stay in Heather's room. H.M. went into her bedroom and sat on the bed; Griffith joined her. Griffith put his hand inside H.M.'s jeans beneath her underwear; he used his fingers to touch her vaginal area. H.M. felt Griffith touching her "private" or vaginal area "for a long time." H.M. felt Griffith's fingers moving, but was not sure if they went inside her vagina. H.M. said Joaquin came into the room and Griffith told Joaquin to leave; Joaquin did not remember doing this.

Griffith told H.M. to change into her pajamas, which she did alone in her bedroom with the door closed. H.M. told Griffith she could do the splits; H.M. did the splits on the living room floor while Griffith watched. Griffith then told H.M. to do the splits on Heather's bed; again Griffith watched. Griffith climbed onto the bed next to H.M., arched his back, and touched his genital area to H.M.'s vaginal area. Both Griffith and H.M. were clothed at the time. H.M. did the splits more than once on the bed, but she could not remember if Griffith asked her to or if she did them on her own.

4.

While H.M. was on the bed with Griffith, she saw Heather through the bedroom window. Griffith got up and left the bedroom. Heather had been gone about 35 to 45 minutes. Heather had spoken with Elise, but she forgot her wallet and returned home so she could purchase cigarettes. Heather spoke with Griffith; she did not notice anything unusual about his demeanor. H.M. and Joaquin were in Heather's bed; Heather told them she was leaving again to go to the store. H.M. "was looking like she wanted me to stay with her." Heather lied to H.M. and told her she would have Griffith go to the store; Heather never intended for Griffith to go to the store and instead she left to purchase cigarettes. H.M. did not tell her mother what had happened.

After Heather left the second time, Griffith again touched H.M.'s vaginal area with his fingers while they were in H.M.'s bedroom. Heather went to a grocery store less than a mile from the apartment; when she returned, both children were in her bedroom. Heather did not notice anything out of the ordinary.

Heather and Griffith went out onto the patio to talk and smoke cigarettes. Griffith told Heather he had a gun and had killed a man before. Heather did not take Griffith seriously; she thought he "was drunk and being stupid." Shortly thereafter, Heather told Griffith she was tired and went to bed; Griffith left the apartment. Heather joined Joaquin and H.M. in her bed. Heather did not notice anything unusual that night.

Several days later, while Joaquin was getting ready for school, he told Heather that it was "weird" when she had left them with Griffith. When Heather asked what he meant, Joaquin stated that Griffith kept calling H.M. out of bed, but he would not let Joaquin get out of bed. Heather asked H.M. what had happened with Griffith; H.M. stated that Griffith touched her. H.M. cried and asked Heather not to say anything because she was scared she would not get to play with Griffith's children anymore.

After taking the children to school, Heather went to work. She began crying and told her friend and her supervisor what H.M. had told her that morning. Heather went

5.

back to the school, picked up H.M., and drove to the police station to file a report. Heather told H.M. she had to tell the officers what had happened.

Hanford Police Officer Daren Matteson made arrangements for H.M. to be interviewed on November 17, 2010. H.M. was interviewed in the district attorney's office by social worker and forensic interviewer Delia Acosta-Perez; Heather was not in the room at the time of the interview. Matteson did not schedule a sexual assault exam of H.M. because of the length of time that had passed since the assault.

Griffith was charged with committing lewd and lascivious acts on a child under the age of 14 years, a felony violation of Penal Code section 288, subdivision (a).[2] He also was charged with a misdemeanor violation of section 647.6, subdivision (a)(1), annoying or molesting a child. It also was alleged that Griffith was on felony probation at the time he committed the offenses.

Trial commenced on October 4, 2011.

Griffith testified in his own defense. Griffith admitted he had cheated on his wife "a few times." Griffith met and came to know Heather because their children played together; the children frequently went to each other's homes. Griffith and his wife had watched Heather's children at times and Heather had watched their children.

On the evening of November 5, 2010, Heather came outside to drink with Griffith and his nephew; she brought beer. When they ran out of beer, Heather offered to call Jesse to pick some up because she and Griffith did not have any money. Jesse brought an 18-pack of beer and joined them.

Heather talked to Griffith about getting Jesse to leave; she invited Griffith up to her apartment. Griffith testified he and Heather had been having a sexual relationship for about two months and had had sexual relations about six times. Heather bought things for Griffith and wanted him to leave his wife so she could be in a relationship with him.

_____

[2]All further statutory references are to the Penal Code unless otherwise stated.

Heather and Jesse got into an argument, but Griffith did not know what they were arguing about. After Jesse left, Heather and Griffith went into her bedroom and had sexual intercourse. They were interrupted before he ejaculated when Jesse opened the bedroom door, with H.M. standing next to him. Jesse slammed the door; Heather told Griffith to wait there and she covered up and ran after Jesse. Jesse left and Heather returned to the bedroom. Heather and Griffith continued having sexual intercourse until Griffith ejaculated.

Afterwards, Heather called Elise to get methamphetamine for Griffith and Heather to smoke. Griffith believed Heather already had smoked methamphetamine that evening, before she came outside to join Griffith and his nephew. He thought this because she was "kind of hyper." Heather asked Griffith to watch her children while she went to get the methamphetamine.

Griffith remembered going out to the patio to smoke while Heather was gone. He told the children to lie down and put them in their mother's bed. Joaquin was "whiney," but H.M. "basically listened." Heather returned for a moment, but then left a second time and came back with the methamphetamine. Griffith and Heather smoked methamphetamine together, after which they showered together and then Griffith went home.

Griffith denied doing anything sexual with H.M. and offered no reason why H.M. would make such allegations.

Frances testified for the defense. She and Griffith had been married eight years. She never saw Griffith touch a child inappropriately and never saw him molest H.M., even though Griffith regularly interacted with H.M.

At a hearing outside the presence of the jury, defense counsel indicated she wanted to call Sophia Apodaca, the apartment manager, as a witness to impeach Heather. A ruling on the request was deferred.

7.

Defense counsel called Heather to testify as a defense witness. Heather testified she had had a conversation with Apodaca about moving to a different apartment. This conversation was after the November 5, 2010, incident and after the police were involved. Heather testified Apodaca was aware of allegations and "already knew a lot of it because of the police officer." Defense counsel then asked Heather whether she had told Apodaca that Griffith had put four fingers and a fist into H.M.; Heather replied, "No." Heather was then asked whether she had told Apodaca that she did not want to have H.M. "checked" or physically examined. Again, Heather replied, "No."

Apodaca then testified at an Evidence Code section 402 hearing. Apodaca testified Heather told her H.M. had stated Griffith "stuck four fingers in her and a whole fist." Apodaca asked if Heather was going to have H.M. checked and Heather stated, "no." Defense counsel then asked to have Apodaca testify before the jury for purposes of impeaching Heather's testimony. The prosecutor objected on the grounds the statements constituted hearsay and were not relevant. The trial court ruled that the proposed testimony was not relevant and was hearsay. Apodaca was not permitted to testify before the jury and Heather's testimony on these points was not impeached.

On October 11, 2011, Griffith sought to fire his retained counsel on the grounds she had been intoxicated during the trial and rendered ineffective assistance. The trial court conducted a *Marsden* hearing and denied the request. On October 12, 2011, the jury returned verdicts of guilty on all charges.

After retaining new counsel, Griffith filed a motion for new trial on March 20, 2012. The trial court held a hearing on the motion on April 27, 2012, and denied the motion on May 4, 2012. On May 17, 2012, the trial court sentenced Griffith to a term of 10 years in prison.

## DISCUSSION

Griffith's primary contention is that the trial court abused its discretion and violated his constitutional rights when it denied his request to discharge his retained

8.

counsel and instead conducted a hearing pursuant to *Marsden, supra,* 2 Cal.3d 118. In a related issue, Griffith also argues the trial court abused its discretion when it denied his motion for a new trial, which was based largely upon defense counsel's intoxication during his trial.

In addition, Griffith contends the trial court erred in its ruling on several evidentiary issues and in instructing the jury. Finally, Griffith asserts error in that the trial court failed to allow him to raise an issue of juror misconduct and failed to conduct an adequate inquiry into the potential misconduct.

## I.     Discharge of Retained Counsel

### *Factual summary*

On Friday, October 7, 2011, Griffith appeared in court as scheduled to continue with his trial. His privately retained defense counsel, Michelle Winspur, was not present. The trial court informed Griffith that Winspur was "ill today and is unable to proceed to trial." The trial court had asked attorney Marianne Gilbert to be present and represent Griffith for purposes of that hearing. The trial court stated it intended to resume the trial the following Tuesday, October 11, 2011, but noted that if a full jury was not available to finish the trial, a mistrial would be declared.

The trial court indicated it was reluctant to declare a mistrial. Griffith indicated the trial had been hard on his family; he wanted the trial to come to a close; and he was visibly upset. The trial court instructed Griffith to "collect yourself a little bit."

After a few minutes, the trial court summoned the jury, explained that Winspur was "ill this morning," and that Gilbert was making a special appearance. The jury was then dismissed until the following Tuesday. When Griffith asked the trial court what was wrong with Winspur, the trial court informed him he would have to ask her that question on Tuesday.

In fact, Winspur was "impaired" because she was under the influence of alcohol; her car was searched and was towed from the courthouse.

9.

On Tuesday, October 11, 2011, both Winspur and Gilbert were present in court, as was Griffith. Gilbert moved for a mistrial and informed the trial court that Griffith had told her on Friday that Winspur had been drinking throughout the course of the trial, law enforcement had gone through Winspur's car outside the courthouse on Friday, and jurors may have seen the search of Winspur's car.

The trial court asked Winspur if she had been drinking or under the influence of any drug during the course of the trial; Winspur responded that she had not. The prosecutor indicated he had observed Winspur and nothing indicated she was under the influence during the presentation of evidence. The trial court also stated it saw no indications Winspur was under the influence.

Griffith responded that he had observed Winspur stumbling as she walked into the courtroom on Friday when the trial was postponed and that "You guys took her to the back for some odd reason." Griffith stated he wanted to fire Winspur and hire Gilbert as his attorney. The trial court denied the request as untimely and then indicated, "I'm going to treat it as a *Marsden* Hearing."

At the *Marsden* hearing, the trial court allowed Griffith and Winspur to be present; Gilbert was not permitted to attend the hearing. The trial court asked Griffith to state his concerns about Winspur. Griffith stated Winspur was not representing him adequately in that she had been intoxicated; she had not subpoenaed witnesses; he had had difficulty reaching her or getting her to return calls; and Winspur told him after he testified that he had "fuck[ed] up" and she ridiculed him, making these comments outside the courtroom and in front of other people. Griffith also provided a letter to the trial court noting that he had smelled alcohol on Winspur's breath and had observed her staggering.

The trial court denied the request to fire Winspur because it was untimely. The trial court made no inquiry on the record of how much time Gilbert would need to proceed with the trial. Also, no inquiry was made of the jury as to how much of a

10.

continuance it could tolerate.  It appears the trial court based its decision solely on the request being made close to the end of the trial.

*Analysis*

A criminal defendant has the due process right to appear and defend with retained counsel of his or her choice.  (*People v. Leonard* (2000) 78 Cal.App.4th 776, 784.)  The defendant may discharge retained counsel with or without cause.  (*People v. Ortiz* (1990) 51 Cal.3d 975, 983 (*Ortiz*).)  In contrast to situations involving appointed counsel, a defendant may discharge retained counsel without satisfying *Marsden* requirements.  (*Ortiz,* at p. 984.)

The defendant's right to discharge retained counsel, however, is not absolute.  (*Ortiz, supra,* 51 Cal.3d at p. 983.)  The trial court retains discretion to deny such a motion if the discharge would (1) cause ""'significant prejudice"'" to the defendant, or (2) was "untimely and would result in '"a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case."'  [Citations.]" (*People v. Lara* (2001) 86 Cal.App.4th 139, 153 (*Lara*).)

The trial court may exercise its discretion to deny such a request if the defendant is unjustifiably dilatory or arbitrarily seeks to substitute counsel at the time of trial.  (*People v. Blake* (1980) 105 Cal.App.3d 619, 623-624.)  The trial court is obligated to exercise this discretion reasonably:  "'a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.'  [Citation.]"  (*Ortiz, supra*, 51 Cal.3d at p. 984.)  A trial court faced with a request to discharge retained counsel "must balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution.  [Citations.]" (*Lara, supra,* 86 Cal.App.4th at p. 153.)

Contrary to the trial court's statement, the burden was never on Griffith to establish that Winspur was ineffective or that there was an irreconcilable conflict in order to discharge Winspur.  (*Lara, supra*, 86 Cal.App.4th at p. 155.)  The record clearly

11.

indicates the trial court was aware that Winspur was retained counsel but applied a legally incorrect standard in assessing Griffith's complaints against Winspur.

The trial court's improper reliance on *Marsden* does not by itself automatically mandate reversal. (*Lara, supra*, 86 Cal.App.4th at p. 155.) The trial court was required to assess whether denying the request to discharge retained counsel would (1) significantly prejudice Griffith, for example, by requiring him to proceed with counsel who was impaired, or (2) result in a disruption of the orderly processes of justice *unreasonable under the circumstances*. (*Ibid.*, italics added.) If these factors were not implicated in Griffith's request to discharge Winspur, the denial of his request to discharge retained counsel requires reversal of his convictions. (*Ortiz, supra*, 51 Cal.3d at p. 988; *Lara,* at p. 155.)

### *Abuse of discretion*

The People note that Griffith asked to discharge his retained counsel after presentation of evidence, but before closing argument and instructing the jury. The People do not claim that Griffith's request was brought in bad faith. The People, however, do contend that Griffith's request to discharge his retained counsel, Winspur, properly was denied because it was untimely and would have disrupted the trial. The People's argument misses the point. The standard is whether the disruption would have been unreasonable under the circumstances or whether Griffith would have been prejudiced by denying the request. (*Lara, supra*, 86 Cal.App.4th at p. 155.)

Winspur appeared in the trial court Friday morning in an inebriated state and was clearly thoroughly unfit to represent any client. She was escorted from the courtroom and the trial was continued; yet, the trial court failed on that day to disclose the true reasons for the delay to Griffith, instead stating counsel was "ill." It is a reasonable inference that if Winspur appeared in court in a thoroughly inebriated state on one morning, she might have consumed alcohol on another day during the trial, albeit to a lesser extent. Asking Winspur whether she was "under the influence" during the trial, as

12.

the trial court did here, is an inadequate inquiry; Winspur may have consumed alcohol, yet believed herself not to be "under the influence."

As set forth in the discussion of the motion for new trial, Winspur's responses to whether she had been drinking during Griffith's trial changed from outright denials to equivocal statements that she could not remember or that her consumption of alcohol was not such as to render her under the influence. Furthermore, as brought forth in the motion for new trial, credible witnesses were prepared to testify that Winspur had been observed arriving at the courthouse, prior to October 7, 2011, in an inebriated state. Consequently, law enforcement was watching for her arrival on October 7.

As for Griffith's claim that Winspur failed to contact and subpoena witnesses, the trial court noted that presentation of evidence and whether to call witnesses was a matter of trial tactics. The exercise of that discretion, however, assumes tactical decisions are being made by an attorney in full possession of his or her reasoning ability—not by one who may be under the influence of alcohol at the time a tactical decision is being made. Even if Winspur did not appear in court while under the influence except on the one day, October 7, 2011, there was no inquiry into whether tactical decisions had been made by Winspur outside the courtroom while free of the effects of alcohol. It is a reasonable inference that an attorney who has consumed alcohol to such an extent that he or she is inebriated early in the morning on a trial day has a significant problem with alcohol, which may manifest itself in a variety of ways outside the courtroom. As Winspur eventually acknowledged during the motion for new trial, she had been drinking during the trial.

The trial court also failed to conduct an adequate inquiry into whether any jurors had observed law enforcement detaining Winspur and searching her car; in fact, the trial court failed to conduct any inquiry on this point, even though Gilbert raised this concern in the motion for mistrial. The trial court apparently assumed that jurors had not seen this because jurors were excused at 9:48 a.m. and the car was towed at 11:20 a.m. This

13.

assumption on the trial court's part is flawed; the car was being searched and Winspur was detained for a period of time before the vehicle was towed from the courthouse. Yet, the trial court asked the jurors only if they had overheard any conversation between Griffith and his wife after the conclusion of the proceedings on Friday, October 7, 2011.

The trial court stated that Griffith would not be allowed to fire Winspur and hire Gilbert as his attorney because Gilbert was not ready to proceed immediately with the trial. The trial court, however, did not ask Gilbert if she was prepared to proceed to trial, and, if not, how long of a continuance would be needed to adequately prepare. There was no inquiry of the jurors concerning inconvenience to them. The record does not reflect any attempt to weigh whether the disruption to the trial from a delay necessitated by substituting counsel was unreasonable or to assess the prejudice to Griffith from denying his request.

The trial court was required to assess whether denying the request to discharge Winspur would (1) significantly prejudice Griffith, or (2) result in a disruption of the orderly processes of justice unreasonable under the circumstances. (*Ortiz, supra*, 51 Cal.3d at p. 988; *Lara, supra,* 86 Cal.App.4th at p. 155.) The record reflects that an incorrect *Marsden* standard was applied to Griffith's request to fire his retained counsel and no assessment of these two factors was made.

Where fundamental rights are affected by the exercise of discretion by a trial court, only where the trial court is under no misconception as to the legal basis for its action can such discretion truly be exercised. (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 496; *Lara, supra*, 86 Cal.App.4th at p. 165.) Given the trial court's application of an incorrect standard, we cannot say the trial court properly exercised its discretion in denying Griffith's request to discharge retained counsel. Griffith's conviction, therefore, must be reversed and the matter remanded to the trial court. (*Ortiz, supra*, 51 Cal.3d at p. 988; *Lara,* at p. 155.)

14.

The People suggest the proper remedy is a remand for a hearing on Griffith's request applying the proper standard. That remedy is completely impractical as it would require a recreation of the situation as it existed in October 2011 in order to make an adequate record for review. Such a recreation would include bringing back Gilbert to determine how long she would have needed to prepare to give the closing argument and bringing back the jury so it could inform the trial court of how it would have been inconvenienced in October 2011.

Also, in light of Winspur's testimony during the motion for new trial and other proffered evidence in that motion, discussed *post,* we reluctantly reach the conclusion that Griffith's conviction must be reversed because of prejudice to Griffith by requiring him to continue with Winspur. Additionally, there is the trial court's failure to make an adequate inquiry into potential juror misconduct.

## II.     Juror Misconduct

When trial resumed on the Tuesday after Winspur was removed from the courtroom, Gilbert moved for a mistrial in Griffith's case. One of the bases for the mistrial was Griffith's concern that jurors may have seen law enforcement searching Winspur's car. Griffith had been watching law enforcement search the car, saw a crowd of people watching the scene, and observed at least two jurors in the area. Griffith was standing with his wife and talking about the incident to his wife.

The prosecutor and trial court opined that it was doubtful the jurors had witnessed the scene because Winspur's car was towed around 11:20 a.m. and the jurors were dismissed around 9:48 a.m. Griffith responded that the trial court had to take into account the time law enforcement spent searching Winspur's car before it was towed.

After conducting the *Marsden* hearing on whether Griffith would be allowed to fire Winspur, the trial court brought the jury back into the courtroom. Gilbert was not present. The trial court asked the jurors for a show of hands of anyone who had heard a

comment made by Griffith on Friday after the jurors were dismissed. No one raised his or her hand and the trial proceeded.

*Analysis*

"A trial court must conduct a sufficient inquiry to determine facts alleged as juror misconduct 'whenever the court is put on notice that good cause to discharge a juror may exist.' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 547.) "Certainly, when there is a claim of juror misconduct, the court must conduct 'an inquiry sufficient to determine the facts … whenever the court is put on notice that good cause to discharge a juror may exist.' [Citation.] But failure to conduct a sufficient inquiry is ordinarily viewed as an abuse of discretion, rather than as constitutional error. [Citations.]" (*People v. Pinholster* (1992) 1 Cal.4th 865, 927-928 (*Pinholster*).)

Here, the trial court's inquiry was deficient. Apparently, the trial court was aware of counsel's condition and that she was in the custody of law enforcement. The trial court failed to ask the jurors if any of them had seen Winspur Friday morning, when she was obviously intoxicated. Although the jurors were not present in the courtroom on Friday when Winspur was removed, no inquiry was made as to whether any juror had observed Winspur in the courthouse parking lot or anywhere in the building Friday morning. Since Winspur's inebriated state was apparent when she entered the courtroom, presumably it was apparent to anyone who might have observed her prior to her entry into the courtroom.

Also, no inquiry was made about any observations of the search of a car outside the courthouse on Friday, and, if they had seen the search, whether they knew whose car was being searched. At a minimum, the trial court should have made this inquiry of the two jurors identified by Griffith as present during the search. We fail to see how the trial court's one question to the jurors about whether they overheard a conversation between Griffith and his wife constituted any inquiry into whether any juror had observed law enforcement searching Winspur's car outside the courthouse.

16.

Griffith did not have assistance from Gilbert during this inquiry, as only Winspur and the prosecutor were present. When Griffith tried to interject and make comments during the proceedings, the trial court silenced him and informed him any remarks had to be made through Winspur. As Griffith points out, Winspur had a conflict of interest in this matter and could not be expected to insist the jury be questioned about whether any of them observed her public intoxication and the search of her vehicle by law enforcement. (*People v. Doolin* (2009) 45 Cal.4th 390, 417.)

Moreover, during the *Marsden* hearing Griffith tried to raise an issue of potential juror misconduct with the trial court. The trial court cut him off, indicating it was inappropriate for Griffith to raise juror misconduct issues at that time. Griffith had a specific issue about one juror that he wished to raise. There is no indication in the record that Griffith ever was allowed to bring this issue to the trial court's attention.

As with Griffith's request to fire his retained counsel, the trial court abused its discretion when it failed to conduct an adequate inquiry into potential juror misconduct. (*Pinholster, supra,* 1 Cal.4th at pp. 927-928.)

## III. New Trial Motion

On March 20, 2012, after the jury had rendered its verdict, Griffith filed a motion for new trial. The motion was filed on behalf of Griffith by Attorney Christopher Martens.

The motion for new trial was based on Winspur rendering ineffective assistance of counsel during the trial and the trial court's abuse of discretion in conducting a *Marsden* hearing when Griffith sought to fire Winspur. We previously addressed in part I, *ante*, the trial court's abuse of discretion in conducting a *Marsden* hearing and failing to balance Griffith's interest in new counsel against any disruption in the trial.

In addition to this basis, the motion for new trial also asserted that Winspur rendered ineffective assistance of counsel in that (1) the trial court had authorized fees for an investigator in the case, yet no investigation of the matter was conducted by Winspur

17.

and no witnesses were called or subpoenaed, except for those witnesses contacted by Griffith himself, and (2) an attorney who presented herself in court in an inebriated state in all likelihood had not completed due diligence and adequate preparation of the case or rendered adequate representation. The motion asserted that Winspur had shown up for trial so intoxicated that she was removed from the courtroom and then arrested for driving under the influence in the courthouse parking lot as she tried to leave.

At the hearing on the motion for new trial, Winspur testified that she did not "believe" she was hung over on the first day of trial. Winspur could not recall whether she was intoxicated on the second day of trial. As for the third day of trial, Winspur maintained that she had not consumed alcohol that morning before coming to court. Implicit in Winspur's answers is that she was consuming alcohol in the evenings during trial, but did not believe she was intoxicated when she came to court in the mornings.

When Martens attempted to question Winspur about her alcohol consumption and the events of Friday, October 7, 2011, Winspur testified she did not remember the date. When Martens clarified it was the fourth day of Griffith's trial, the prosecutor objected on relevance grounds and the trial court sustained the objection. Martens also was precluded by the trial court from questioning Winspur about her drinking at the start of jury selection.

Martens then sought to have a witness, Jerry Costner, testify. The prosecutor again objected on relevance grounds and the trial court asked for an offer of proof. Martens stated that Costner had been informed that Winspur was showing up for court hearings intoxicated and Costner was watching for Winspur to arrive on Friday, October 7, 2011. The trial court interrupted and questioned the relevance of the testimony. Martens stated it was relevant to showing the "full picture of everything that happened in this particular case." Martens asked to make a record of the testimony that Costner would offer; the trial court responded that would be "a waste of time" and not relevant.

18.

Martens next sought to present testimony from Ben Moore, Officer M. Blum, and Jennifer Garcia. All three witnesses had testimony pertaining to events surrounding the fourth day of trial, October 7, 2011. The trial court precluded Martens from calling these witnesses, stating their testimony was "irrelevant." Martens then sought to call two witnesses who would testify that Winspur was arrested after showing up at court under the influence on another case on a day other than October 7. Again, the trial court opined that the testimony was irrelevant.

The trial court denied the motion for new trial, finding there was no evidence Winspur "was impaired at all" during Griffith's trial.

Pursuant to Code of Civil Procedure section 909, we take judicial notice of the records of the State Bar of California, which reflect that a State Bar proceeding was filed against Winspur and she was ordered inactive and ineligible to practice law on January 6, 2012. This was less than three months after she appeared in court in a drunken state and had to be escorted from the courtroom and three months before the motion for new trial. A reasonable inference is that proceedings were pending against Winspur at the time she was representing Griffith in his trial. The suspension from the practice of law lasted until August 1, 2013, a significant period of time, indicating a serious violation. (<http://members.calbar.ca.gov/fal/Member/Detail/200520> [as of Jan. 17, 2014].)

*Analysis*

The determination of a motion for a new trial rests within the trial court's discretion and its decision will not be disturbed unless an abuse of discretion clearly appears. (*People v. Turner* (1994) 8 Cal.4th 137, 212, overruled on another point in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.) In determining whether there has been a proper exercise of discretion, each case must be examined on its own facts. The trial court's factual findings on a motion for new trial will be upheld, whether express or implied, if they are supported by substantial evidence. (*People v. Drake* (1992) 6 Cal.App.4th 92, 97.)

19.

Here, we conclude the trial court abused its discretion when it precluded Griffith from presenting relevant evidence on the issue of Winspur's intoxication during the trial. "Relevant evidence" is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends "'logically, naturally, and by reasonable inference' to establish material facts …. [Citations.]" (*People v. Garceau* (1993) 6 Cal.4th 140, 177.)

Whether Winspur had been observed arriving at the courthouse intoxicated before the fourth day of Griffith's trial was highly relevant. Griffith had testified that he thought Winspur was drinking during the trial and coming to court with the smell of alcohol on her breath, which she attempted to mask. Winspur admitted drinking during the trial, but claimed she was not under the influence in the mornings when she headed to court. Costner apparently was prepared to testify that Winspur had been observed arriving at court in what was an inebriated state prior to October 7, 2011, which is why Costner was watching for Winspur's arrival on the fourth day of trial.

The trial court's determination that testimony about Winspur arriving at other court hearings intoxicated was irrelevant is perhaps not as clear an abuse. However, Griffith should have been allowed to present this testimony as well. Establishing that Winspur had a history or pattern of appearing at court while under the influence of alcohol was relevant to help establish Winspur's conduct during Griffith's trial. A reasonable inference could be made that Winspur's conduct in appearing at other hearings while under the influence of alcohol would be repeated by her in Griffith's trial and bolster Griffith's testimony about smelling alcohol on Winspur's breath.

We also are troubled that the trial court apparently failed to notice, or consider, that Winspur's answers regarding her drinking differed in the motion for new trial versus what she had represented to the trial court during trial when Griffith sought to fire her.

20.

The weight and credibility to be given evidence presented concerning a motion for new trial is for the trial court. (*People v. Gaines* (1962) 204 Cal.App.2d 624, 628.) Here, however, the issue is not the weight and credibility of evidence. The trial court abused its discretion in excluding highly relevant evidence about Winspur's possible impairment and intoxication during trial and when making tactical decisions about the case and then denied the motion for new trial on the basis that Griffith presented no evidence that Winspur was under the influence of alcohol during trial. As such, the denial of the motion for new trial was an abuse of discretion.

## CONCLUSION

We understand the trial court's reluctance to declare a mistrial. We also understand the trial court's reluctance to avoid embarrassment to an attorney in distress. However, that reluctance cannot outweigh a defendant's right to representation.

If the trial court did not have sufficient evidence, in its view, of Winspur's impairment as a result of the events of October 7, 2011, then sufficient evidence demonstrating Winspur's impairment certainly was available by the time of the motion for new trial. While a trial court's findings concerning counsel's competence and sobriety normally would be sufficient upon our review, this record's deficiency, if any, was not the result of a lack of effort by Griffith.

Winspur's changed testimony, from an outright denial that she had been drinking during trial when asked at the time Griffith sought to fire her, to an admission that she had been drinking but did not "believe" she was still under the influence by the morning, coupled with the proposed testimony of Costner that she had been observed prior to October 7, 2011, arriving at court intoxicated, should have been sufficient for the trial court to expand its inquiry. By the time of the motion for new trial, Winspur's discipline by the State Bar was of record. Surely, the trial court should have inquired about the basis of the State Bar's action and its implication on Griffith's representation.

The evidence available to the trial court clearly demonstrated that Winspur had been drinking during the trial while making tactical decisions, had arrived at court clearly intoxicated on one morning of trial, had been observed arriving under the influence on other days at court, and had lied to the court about her alcohol consumption at the time Griffith sought to fire her.

Griffith must be afforded a new trial with competent counsel who makes tactical decisions and appears in court while in full possession of his or her reasoning ability, not under the influence of alcohol. In light of our conclusion, we need not address the other issues raised by Griffith.

### DISPOSITION

The judgment is reversed and the matter remanded to the trial court.

_____

CORNELL, Acting P.J.

WE CONCUR:

_____

GOMES, J.

_____

HOFF, J.*

---

\* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22.